Cecil McLENDON, Don Vandertulip, Jimmie Carthan, Jr. and Konrad Trojniar, on their own behalf and on behalf of all others similarly situated

v.

CONTINENTAL CAN COMPANY, a corporation, a New York corporation incorporated in 1913; Continental Can Company, Inc., a Delaware corporation; Continental Packaging Company, Inc., a Delaware corporation; The Continental Group, Inc., a New York corporation incorporated in 1982; and KMI Continental Inc., a New York corporation, Appellants,

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO.

No. 89–5596.

United States Court of Appeals, Third Circuit.

Argued Jan. 18, 1990.

Decided July 26, 1990.

As Amended Aug. 14, 1990.

Nicholas DeB. Katzenbach (argued), Douglas S. Eakeley, Riker, Danzig, Scherer & Hyland, Morristown, N.J., for appellants.

Robert Plotkin (argued), John G. Jacobs, Plotkin & Jacobs, Ltd., Robert D. Allison, Chicago, Ill., Daniel P. McIntyre, Falmouth, Me., for appellees.

Before HIGGINBOTHAM, Chief Judge, and BECKER and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

In this class action based on § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, and the Rack-

eteer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., defendant, The Continental Group ("Continental"), appeals from that portion of the district court order granting permanent injunctive relief to the plaintiff class of steelworkers. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

The district court, in its order dated June 15, 1989, specifically found that: (1) Continental instituted and maintained the liability avoidance plan found to be illegal under section 510 of ERISA in *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) as followed by *McLendon v. The Continental Group, Inc.*, Civ. No. 83-1340 (D.N.J. May 10, 1989), *as amended*, 1989 WL 81523 (D.N.J. June 7, 1989); (2) Continental designed the liability avoidance program ("LAP") to prevent employees from attaining eligibility for layoff benefits to which they would become entitled under a 1977 agreement between Continental and the United Steelworkers of America ("USW"); (3) LAP was the determinative factor in laying off the St. Louis class members; and (4) Continental had failed to sustain their burden of proving that any of the 315 St. Louis class members would have lost work in any event. The district court ordered nationwide permanent injunctive relief barring prospective use of the LAP to violate section 510 of ERISA; entered a judgment of liability against Continental in favor of the St. Louis class members; requested a list of St. Louis steelworkers laid off pursuant to the discriminatory plan and ordered Continental to cooperate fully; retained jurisdiction to ensure compliance with the permanent injunction; appointed Professor George L. Priest of the Yale Law School as Special Master to handle settlement or damage claims and any remaining issues in

the case; and ordered that Continental show cause why its "same-loss" defense should not be stricken at every plant nationwide and entered judgment accordingly.[1] Continental raises four issues on appeal; whether the district court erred by: (1) presuming that the determinative factor of every layoff at every plant was the desire to defeat unfunded pension benefits; (2) using that presumption to find liability at 73 St. Louis; (3) rejecting Continental's "same-loss" defense at 73 St. Louis and all other plants and; (4) granting permanent injunctive relief.

For the following reasons, we will affirm.

## I.

### *Factual Background* [2]

A. The Liability Avoidance Plan ("LAP").

Continental entered into a collective bargaining agreement with the United Steelworkers of America, AFL–CIO ("USW") in 1977. This agreement established two pension plans, the "70/75" .pension and the "Rule of 65" pension.[3] These plans were commonly called "Magic Number" benefits because they accrued when the employee reached a certain age and a certain number of years of service. The plans provided layoff benefits to those employees experiencing a break in service for two years or more from plant shutdown, involuntary layoffs, or physical disability. Both plans were implemented on a plantwide seniority system.

Recognizing both that these benefit plans created substantial, unfunded pension liabilities, and that the steel beverage can market was dwindling, Continental developed the LAP to avoid unfunded liabilities by laying off workers close to eligibility for benefits. This program was also

---

1. Some portions of the district court order have been omitted since they are not relevant to this appeal.

2. *See also McLendon v. The Continental Group, Inc.*, 660 F.Supp. 1553, 1555–56 (D.N.J.1987); *McLendon v. The Continental Group, Inc.*, 602

F.Supp. 1492, 1497–98 (D.N.J.1985); *Gavalik*, 812 F.2d at 838–842 (3d Cir.1987).

3. The 70/75 plan had been in existence since 1971. Rule of 65 benefits were developed pursuant to the 1977 collective bargaining agreement. *Gavalik* adequately describes both plans. 812 F.2d at 839.

known as the BELL System.[4] The LAP was executed by a computer tracking system which identified workers at a particular plant according to their age and years of service. It operated nationwide.

The BELL System is really two programs. BELL I involved a "cap and shrink" program. A "cap" is a workforce reduction scheme, accomplished by setting a maximum number of employees, and is designed to eliminate those employees approaching Magic Number benefits. Continental protected workers above the "cap-line" or those employees whose pension under the two plans had already vested. Workers below the cap-line were not usually vested and would not be rehired for a period of five years.[5] Numbered computer codes were assigned to these pension-risk employees to ensure that they would not be rehired prematurely. A "249" or "299" computer signal alerted Continental that an employee so designated could potentially cause it pension funding problems. A "shrink" refers to a workforce reduction from manufacturing or market conditions. BELL II instructed plant managers to shift business to plants with low unfunded pension liabilities or to plants that needed to retain vested employees. Continental employed scattergraphs [6] to identify plant employees close to vesting. The combination of BELL I and BELL II and a sophisticated computer guiding system allowed Continental to implement the LAP corporation-wide. This lawsuit primarily involves the imple-

mentation of the LAP at 73 St. Louis and its causal link with layoffs at that plant.

**B. 73 St. Louis.**

Continental's 73 St. Louis plant produced food, beverage and general packaging cans. Between 1965 and 1972, the plant employed 850 hourly workers. Pursuant to a requirements-output contract, 73 St. Louis supplied Anheuser–Busch's St. Louis brewery with steel cans. At first, this contract occupied 80–85% of the 73 St. Louis plant's capacity. In 1973 and 1974, Anheuser–Busch began using two-piece aluminum cans and its demand for steel cans from Continental declined and 73 St. Louis began losing money. In 1976, in an effort to keep the steel can industry competitive, Anheuser–Busch invited both Continental and American Can Company, Continental's chief competitor, to bid on its St. Louis business. Anheuser–Busch did not accept Continental's contractual demands [7] and awarded the contract to American. Continental produced its last cans for Anheuser–Busch at 73 St. Louis in 1979. When Continental lost the Anheuser–Busch business, it obtained a lower volume contract from Mead–Johnson, a manufacturer of infant formula, and converted 73 St. Louis from beverage to infant formula can production.

Dwindling profits from declining business volume caused Continental to institute measures designed to increase worker pro-

**4.** The district court found that BELL is a reverse acronym for "Let's Limit Employee Benefits" or "Lowest Level of Employee Benefits."

**5.** The five year rule "directly coincided with the five-year limitation on an employee's preferential recall rights under the collective bargaining agreement." *Gavalik,* 812 F.2d at 841, n. 16. Continental adopted a computerized "red flag" system which identified unfunded workers who had been laid off. Once a laid-off worker received a paycheck, the system generated a report to top management. This system served as a measure to ensure that management did not rehire these employees within two years of their termination and as a check on unfunded liabilities; thus avoiding the "creep" trigger of pension eligibility. The "creep" period only applied to the age requirement of Rule of 65 benefits, but applied to either age or service requirements for 70/75 benefits. Thus, an employee

eligible only for Rule of 65 benefits with 18 years of service could "creep" into eligibility for the 70/75 program if rehired within the two year period following termination.

**6.** Scattergraphs identified an employee's age and service requirements at a given moment in time. Thus, a plant manager could determine which employees created the greatest unfunded liability problem on any particular date.

**7.** The Anheuser–Busch purchasing agent stated that Continental refused to make steel cans and insisted on a Management Services Program ("MSP") contract. MSP allowed Continental to sign extended leases on two-piece aluminum line equipment while obtaining financing for that equipment. Thus, Continental could service aluminum canning requirements while recouping capital investment.

ductivity. These measures included a decrease in manning at the plant and the implementation of BELL I and BELL II. Continental laid off workers at 73 St. Louis in 1976, 1977 and 1980, reducing the workforce from 550 in 1976 to 237 by the end of 1980.

## II.

### *Procedural History*

#### A. The Class Action.

Four former employees of Continental plants in Passaic, New Jersey and Chicago, Illinois filed this class action. The court certified a class of all participants in the Continental Pension Plan "who suffered [or will suffer] a break in pension service subsequent to December 1, 1977 ... as a result," in whole or in part, of that capping program [LAP], excluding persons who were employed at plants for which separate class actions had already been adjudicated. App. at 228a.

The class maintains they were laid off pursuant to LAP because they approached eligibility for Magic Number (Rule of 65 or 70/75) pension benefits and that although job openings became available, Continental kept them on permanent layoff to prevent them from achieving a vested right to their pension benefits. App. at 57. The complaint alleged that the LAP violated section 510 of ERISA as well as the Racketeer Influenced and Corrupt Organizations Act ("RICO").

#### B. Pre-Trial Rulings.

In 1987, plaintiff-appellees moved for partial summary judgment on two issues: existence of the LAP and its illegality under section 510 of ERISA. On the basis of this Court's decision in *Gavalik*, involving the same basic issues at Continental's Pittsburgh plant, the district court granted partial summary judgment, holding that Continental was collaterally estopped from relitigating issues establishing liability under section 510 of ERISA. *See McLendon*, 660 F.Supp. at 1564–65.

Later, the district court ordered the plaintiff class to produce a list of claimants, within forty-five days, who could satisfy the *Gavalik* criteria.[8] The district court also bifurcated the RICO and ERISA issues and ordered that the ERISA issues be tried first. Plaintiffs produced two lists totalling 2531 claimants. These claimants came from 45 different Continental plants. Within 30 days, Continental produced evidence opposing the *Gavalik* criteria and supporting a same-loss defense.

To structure the ERISA trial, the district court ordered the plaintiff class to identify the five plants with the largest number of claimants and to disclose evidence with respect to those plants. The court then decided that trials would proceed on a plant-by-plant basis beginning with the plant employing the largest number of claimants: 73 St. Louis.

The district court, deciding cross-motions for summary judgment, held that: (1) any claimant stigmatized by a "249" or "299" status code was presumed to be laid off according to the LAP; (2) ERISA section 502 and ERISA section 510 conferred standing on employees whose discharge was not motivated by a discriminatory intent and employees remote from vesting, respectively; and (3) ERISA section 510 created a cause of action for employees who could not prove they were pension plan participants.

#### C. The 73 St. Louis Trial.

The parties then proceeded to trial, with Continental presenting evidence on the "de-

---

**8.** According to *Gavalik*, individual workers must meet four requirements in order to claim a loss of work related to the discriminatory liability avoidance plan:

At what point and in what amount actual damages, if any, began to accrue as to any particular class member, however, will be a determination to be made in the proceedings upon remand. In those proceedings, individual class members must first establish that they were (1) non-vested employees eligible for 70/75 and Rule of 65 benefits, (2) available for work, (3) labeled as permanently laid off by Continental, and (4) laid off or continued on layoff status prior to attaining eligibility for those benefits.

812 F.2d at 865–66.

terminative factor" and "same-loss" issues at 73 St. Louis. The district court found that every Continental action fell within the scope of the LAP, that the LAP was a determinative factor in each layoff decision, and that Continental had failed to sustain its same-loss defense. The district court later issued an order granting nationwide permanent injunctive relief and Continental has appealed from that order.

## III.

### Standard of Review.

■ The court in *Gavalik* decided that the capping program was a "determinative factor" in laying people off and that the "same-loss" defense is proper. The district court applied the doctrine of collateral estoppel to decide identical issues in this case. Whether the district court properly applied that doctrine is reviewed for abuse of discretion. *Park Lane Hosiery Company, Inc. v. Shore* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979).

■ Although reviewed for abuse of discretion, a permanent injunction requires closer scrutiny "since permanent injunction cases present a more fully developed record." *Int'l Union, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir.1987). The terms of an injunction are reviewed according to the above standard, but factual determinations prerequisite to issuing the injunction are reviewed for clear error, and we conduct a plenary review of legal questions. *John F. Harkins Co. Inc. v.*

*Waldinger Corp.*, 796 F.2d 657, 658 (3d Cir.1986).

## IV.

### A. *Elements of a Section 510 Claim.*

■ This appeal questions the district court's application of section 510 of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1140 (1985). Section 510 prohibits an employer from interfering with an employee's protected rights. In order to obtain injunctive relief under section 510, an aggrieved plaintiff class must prove that an employer engaged in prohibited conduct intending to interfere [9] with an employee's protected rights.[10] *See* 29 U.S.C. § 1140 (1985). *See also Gavalik*, 812 F.2d at 852. To get money damages awarded in addition to injunctive relief, an individual class member must also prove that the prohibited conduct interfered with pension rights. *Gavalik*, 812 F.2d at 859–60 (determinative factor test); *Lusardi v. Lechner*, 855 F.2d 1062, 1067 (3d Cir.1988).

■ In this case, the plaintiff class has proved its case for injunctive relief. First of all, Continental's layoff benefits plans are employee "rights" protected by ERISA. *McLendon v. The Continental Group, Inc.*, 602 F.Supp. 1492, 1499 (D.N.J.1985); *see also* 29 U.S.C. § 1002(1)(A) (1985). Second, Continental's use of the LAP constituted "prohibited conduct." [11] *Gavalik*, 812 F.2d at 855, n. 36. Third, Continental developed and used the LAP specifically intending to interfere with their employee's benefit plans. *Gavalik*, 812 F.2d at 857. Continental is collaterally estopped from

9. An employer's "specific intent" (or "purpose") to interfere with employee pension rights constitutes the "key factor" in establishing a section 510 violation. *Gavalik*, 812 F.2d at 851, *citing Watkinson v. Great Atlantic & Pacific Tea Co., Inc.*, 585 F.Supp. 879, 883 (E.D.Pa.1984), *quoting Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd*, 742 F.2d 1441 (2d Cir. 1983). The evidentiary burden of proving specific intent rests with the plaintiff class. *Gavalik*, 812 F.2d at 851; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

10. The class does not need to prove actual interference to obtain injunctive relief. *Zipf v.*

*American Tel. and Tel. Co.*, 799 F.2d 889, 893 (3d Cir.1986) ("The statutory language forbids conduct taken for 'the purpose of interfering with the attainment of any right to which such participant *may* become entitled,' regardless of whether the interference is successful and regardless of whether the participant would have actually received the benefits absent the interference.").

11. "Prohibited conduct" includes any attempt to "discharge, fine, suspend, expel, discipline, or discriminate", 29 U.S.C. § 1140, against a vesting employee.

challenging these conclusions by *Gavalik*.[12]

This appeal questions how the district court handled the individual damage claims. As we have noted, to recover a monetary award, individual class members at each plant must satisfy the additional causation requirement. Since this case involves a nationwide plan to interfere with pension benefits, the individual plaintiffs must prove that the plan was implemented at their plant and caused their layoffs. Plaintiff must prove that "but for" the discriminatory purpose, he or she would not have lost work. *Gavalik*, 812 F.2d at 859–60, *quoting Bellissimo*, 764 F.2d at 179, n. 1.

Once the plaintiffs have proved causation, defendant can escape liability if it establishes that other reasons, apart from the discriminatory purpose, would have caused layoffs in any event.

Continental must establish either collectively or individually that class members would have suffered the *same loss* of work even in the absence of the illegal plan. Continental's burden on this issue will be one of persuasion.

*Gavalik*, 812 F.2d at 866 (emphasis added). "Same-loss" requires the defendant to prove a legitimate reason for dismissal wholly apart from its established discriminatory policy. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gavalik*, 812 F.2d at 863, 866. Where the legitimate and illegitimate reasons for dismissal remain inseparable, the defendant has not proved "same-loss."

### B. Direct Evidence at 73 St. Louis: Implementation and Causation.

 Continental argues that the district court misinterpreted the "smoking-gun" standard [13] and erred by applying the

**12.** *Gavalik* and this case raise the same basic legal issues. Both actions address the claim that Continental's LAP violated Section 510 of ERISA. *Gavalik* resulted in a judgment on the merits. 812 F.2d at 865–66. Both the prohibited conduct and employee-pension-right prongs of a section 510 claim were established in that opinion.

Chief Judge Higginbotham wrote for the Court, "Continental's liability avoidance scheme constituted a violation of ERISA when, pursuant to that scheme, individual class members—whether currently at work or already on layoff status—were designated as permanently laid off for the purpose of defeating their pension eligibility." *Gavalik*, 812 F.2d at 865. That the LAP was alive, well, and discriminatory is well-documented throughout the *Gavalik* opinion, and in the record that was before the district court. Continental vigorously litigated these issues since the LAP had been used nationwide and the company fully expected further actions by steelworkers at other plants. Subsequent judgments have been consistent with *Gavalik* and have afforded Continental the same procedural opportunities available to it in *Gavalik*. *See McLendon v. The Continental Group, Inc.*, 660 F.Supp. 1553 (D.N.J.1987) (offensive collateral estoppel fully discussed). Indeed, the district court specifically found that Continental had systematically instituted this program in order to eliminate unfunded pension liabilities.

**13.** *Gavalik* provides that the specific intent element of a section 510 claim can be proven by either circumstantial or smoking gun evidence. When proven by circumstantial evidence, the shifting burdens analysis applies; however, no such shifting is necessary when smoking gun evidence is presented. *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876, 104 S.Ct. 2794, 2800, 81 L.Ed.2d 718 (1984); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Corp.*, 424 U.S. 747, 772, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976).

Where the plaintiff class claims a wholly illegitimate basis for worker dismissal and circumstantial evidence establishes a discriminatory intent, an inference of unlawful discrimination has been raised. *Texas Dep't. of Comm. Affairs v. Burdine*, 450 U.S. 248, 250–52, 101 S.Ct. 1089, 1092–93, 67 L.Ed.2d 207 (1981). The burden of production then shifts to the defendant-employer who may rebut this inference by offering a legitimate, non-discriminatory reason for the individual's dismissal. *Burdine*, 450 U.S. at 250–52, 101 S.Ct. at 1092–93. Where a legitimate reason for dismissal has been provided, plaintiff must establish that the proffered reason was pretextual. *Gavalik*, 812 F.2d at 853 (*citations omitted*). Ultimately, in order to obtain money damages, the plaintiff's burden of persuasion requires proof that, "but for" the discriminatory intent, s/he would not have been laid off. *Gavalik*, 812 F.2d at 859–60. The ultimate burden of persuasion "remains *at all times* with the plaintiff." *Gavalik*, 812 F.2d at 852, *quoting Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

To escape liability, a defendant must then show that the plaintiff would have lost his/her job even in the absence of the discriminatory intent. *Gavalik*, 812 F.2d at 863.

73 St. Louis evidence to all plants nationwide and not allowing Continental to defeat liability through the use of a "same-loss" defense at trials for each plant.[14] The class provided the district court with direct evidence that management implemented the LAP at 73 St. Louis and that implementation of that plan caused the layoffs at 73 St. Louis.[15] The court used that evidence to find that the plaintiff class proved that the plan was implemented at 73 St. Louis. These findings are not clearly erroneous.

The record shows that at a June 1976 meeting, Continental management determined that "St. Louis must be capped no later than 12/78 ... We must select an operating program that provides at the capped level the minimum personnel liability by the end of 1981." App. at 9728a. This objective was realized in 1977 when an internal memo indicated that the cap "[was] now a reality." App. at 9730a. The plant manager at this time denied knowledge of a "cap and shrink" program at 73 St. Louis. Nevertheless, he received memos discussing capping dates, reducing volume to fit manpower, avoiding recall of workers on permanent layoff, and citing the need for the "shelter"[16] to be put in place by 1977. Significantly, the 178 workers laid off during this period (1976–77) fit the official cap-line designated in a 1979 Continental audit.

In 1980, a new person became manager of 73 St. Louis. Continental management specifically instructed him to "cap" the plant at a level of 237 employees by the end of 1980. The 237 level was considered "ideal" since it capped all employees with 19 years of service or less, thus eliminating costly unfunded Rule of 65 or 70/75 benefits.[17] Continental memorialized this "message":

> Considering that our current contract with Mead–Johnson expires at the end of 1982, and that a new Steel Worker's contract will be negotiated early 1981, it is essential that we position ourselves to the lowest unfunded liability level by 12/31/80; therefore, we are proposing to reduce the P & M workforce at 73 St. Louis to a 237 level by the end of 1980 but maintain the option to increase from this level (not to exceed 316) in the event we renegotiate a continuation of the Mead–Johnson business and a favorable Steel Worker contract or an excellerated [sic] attrition rate, obviously this option would only be implemented as a result of sound economic and or business needs. In summation, we must position ourselves to be at the lowest unfunded liability level by the end of 1980 and at the same time have the ability to react to business or economic changes. Capping at the 237 level with the option to increase when/if justified affords us maxi-

If the plaintiff raises an initial discriminatory inference by using circumstantial evidence and the defendant fails to rebut that inference by showing a legitimate, non-discriminatory reason, judgment should be entered in favor of the plaintiff class. *Gavalik*, 812 F.2d at 853, *citing Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977).

**14.** Continental confuses the smoking gun evidence standard adopted in *Gavalik* regarding proof of specific intent to interfere with pension rights with the direct evidence presented to the district court regarding Continental's implementation of the LAP at 73 St. Louis and its causal relation to the layoffs. Individual plaintiffs need not retry the issue of whether the LAP was designed with the intent to interfere with their pension rights as *Gavalik* already establishes that the LAP was designed with the specific intent to cause such interference. Implementation at any plant carries with it the inescapable conclusion that the plan was implemented with

the intent to interfere with the pension rights of the employees at the plant.

**15.** The district court referred to the evidence as not only a smoking gun, but a "fusillade."

**16.** The district court opinion indicates that the plant manager understood the word "shelter" to mean "cap."

**17.** In addition to identifying the 19 year level of 237 employees for 73 St. Louis, App. at 9082a lists various "caps" for other Continental plants. For example, 15 Cincy was scheduled to be capped at a "17 year" level of 153 employees in 1983 while 64 North Grand was to be capped in 1982 at a "19 year" level of 205 employees. These year levels eliminate employees with years of service up to the level while "sheltering" employees whose benefits have already accrued. This memo *documents* liability avoidance.

mum business flexibility. App. at 10887a.

Continental executives provided specific instructions for accomplishing the cap at 73 St. Louis. Indeed, one such executive testified that the manager participated in developing the final capped figure of 237.

The projections of cap level proved so accurate that precisely 237 employees remained at 73 St. Louis at the end of 1980. Continental management again documented this precision.

It is readily apparent when you review the above numbers that all current employees are rule 65/20 qualified and/or 70–75 qualified or each worth $100,000 in unfunded benefit liabilities.

The last capping action to take place at the St. Louis plant was at the end of 1980 bringing the Plant's population to the current level of 237. This capping action required the layoff of 163 hourly employees with seniority dates ranging from 08–14–61 to 09–09–68. A prior capping action took place during 1976 and 1977 wherein 178 employees were laid off, their seniority dates ranged from 9/9/68 to 9/10/73. Since this action took place, 49 employees have broken employment with Continental and the remaining 129 will break employment (exhaust recall rights) by the end of 1982. Supp. App. at 11256.

[W]e must, if practical, shrink and cap our work forces in order to prevent currently inexpensive D.V.B.'s [Deferred Vested Benefits] from acquiring enough points to attain the very costly 70/75 category. App. at 10793a.

The court found specifically that Continental adjusted its business "to the capped work force rather than the reverse." App. at 3668a. The court further found that "the overall long term strategy was to end the employment of all United Steel Workers ... Therefore, it is clear that this was a long-range strategy that even affected those who might have been remote from vesting at the time of layoff. In any event, to get at those close to vesting, it was necessary to lay off those further distant." App. at 3668–3669a.

In addition, the record shows that Continental could have accepted the Anheuser–Busch contract during the mid–1970's and that Anheuser–Busch wanted to keep the steel can industry competitive. Nevertheless, the contractual obligations with Anheuser–Busch would have undermined efforts to terminate increasingly expensive union workers. Thus, the evidence shows concerns over liability avoidance controlled business decisions at 73 St. Louis.[18] The record amply supports the court's findings.

Faced with the direct evidence of causation, Continental had to prove a "same-loss" defense to escape liability for its actions at 73 St. Louis. Contrary to Continental's assertions, the district court allowed them to produce evidence of legitimate business reasons for their layoff decisions. At trial, Continental produced an expert witness who opined that, absent economic pension indicia, the steelworkers would have been laid off in any event due to declining business volume. The district court did not ignore that evidence; it chose to reject the opinion because it never accounted for the LAP's effect on business volume decisions; a factor that was critical in *Gavalik*, 812 F.2d at 863. The district court found that Continental could not separate the illegal policy from legitimate business decisions. Continental's evidence did not persuade the district court that same-loss had been demonstrated at 73 St. Louis.[19]

---

18. The district court likewise concluded "that the layoffs and the failure to recall at St. Louis were pursuant to the Liability Avoidance Program." App. at 3703a.

19. Continental's key witness was Dr. Marshall, who produced data on the decline of the can industry. Continental contends that the district court ignored the testimony. We disagree. The district court did not find it persuasive. The district court cited three reasons for discrediting some of Dr. Marshall's testimony. First, even Dr. Marshall's estimated reductions in workforce from non Plan-related activities were higher than actually occurred. Second, his statistics were based upon the volume of work coming into the plant and there was evidence that decisions regulating work volume were based, in part, on the LAP. Thus, Continental may have purposely decreased work at certain plants to reduce the workforce in those plants. Dr. Mar-

Nevertheless, implementation and causation questions are unique to the individual plants. Consequently, although Continental failed to establish the same-loss defense here, it is not prevented from offering proof of same-loss at other trials, and for other plants. Although the court did not strike the "same-loss" defense *in terms*, its opinions and orders can be read to preclude Continental from offering this defense for other plants, and to that extent, the district court erred. Continental must be given the opportunity to present this defense for each plant. Plaintiffs must establish that the Capping Program was implemented at their plant. At that point, Continental can argue that the plaintiffs would have suffered the same loss, notwithstanding the Capping Program. We believe that evidence of the same-loss defense at different plants require separate trials for each location. It is conceivable that a plant closed because it lost its sole customer or from some natural disaster. In either case, evidence of same-loss is different and distinct for each plant. Continental tried to prove that customer cancellations were responsible for the St. Louis layoffs. The district court did not believe that testimony and the district court's findings are not clearly erroneous. Nevertheless, Continental's evidence from other plants may be more convincing. This trial has not given Continental a sufficient opportunity to present evidence from other plants for other trials.[20]

## V.
### *Continental's Determinative Factor Argument.*

Continental maintains that by finding the LAP to be a determinative factor in

every layoff decision, the district court foreclosed them from litigating implementation and causation issues at all plants. This is not so. In fact, the court specifically identified the remaining 315 73 St. Louis class members as recipients of the determinative factor presumption without extending the presumption to class members not employed at 73 St. Louis. Other class members seeking money damages are still required to prove that at their particular plants: 1) the LAP was implemented, and; 2) but for Continental's impermissible consideration of their pending pension eligibility, they would not have lost work. *Gavalik*, 812 F.2d at 859–60.

Implicit in Continental's argument is the contention that the district court misapplied the determinative factor analysis of *Gavalik*. We disagree. *Gavalik's* finding that the plan was adopted and used with the intent to interfere with an employee's pension rights inures to the benefit of an individual class member unless the class member challenges conduct different than that litigated on the classwide level. *Gavalik*, 812 F.2d at 860–61. Here, none of the individual plaintiffs were challenging conduct different than that challenged in *Gavalik*. Thus, at the individual liability stage, a plaintiff challenging layoff practices pursuant to the LAP need not prove that the plan and Continental actions implementing that plan constituted prohibited conduct, that the two pension plans are employee "rights" within the meaning of section 510, or that the plan was adopted with the specific intent to interfere with those pension rights. These elements were established by our decision in *Gavalik*, 812 F.2d at 854–55, 857, 865.

---

shall's estimates about the number of layoffs from natural decline are arguably irrelevant. Third, Dr. Marshall's testimony did not address plaintiffs' contentions about the timing of layoffs. Dr. Marshall said these workers would have been laid off anyway. But, if LAP was responsible for earlier layoffs, then plaintiffs are entitled to the damages they suffered as a result of premature dismissals.

A critical element in the district court's decision is not only that it did not credit or believe Continental's experts, but also that it did not find testimony from them sufficient to overcome what it referred to as "a fusillade" of

evidence that all decisions at Continental were made pursuant to LAP. The district court's findings were not against the weight of evidence.

**20.** The district court instructed the parties that "[t]rial [would] proceed one plant at a time, beginning with the plant containing the most alleged class members [St. Louis]." App. at 1907a. Continental was never given any indication that they would not be given further opportunity to present evidence on plants other than St. Louis.

However, a plaintiff must still prove that the LAP was implemented at his/her plant and interfered with unfunded pension benefits. Proof of actual interference satisfies the causation requirement and provides concrete evidence that the LAP was a determinative factor in reaching layoff decisions. *Gavalik*, 812 F.2d at 859–60. A plaintiff may only be eligible to recover money damages when this burden is satisfied by a preponderance of the evidence. Plaintiffs at 73 St. Louis met this burden.

The defendant may then escape liability only by establishing the "same-loss" defense on a classwide or individual basis, depending on whether the defense is unique to the individual plant or employee at that plant. *Gavalik*, 812 F.2d at 866. At 73 St. Louis, Continental has already made an unsuccessful attempt to prove same-loss. Thus, the individual class member at that plant may now be entitled to recover monetary damages for Continental's illegal conduct. *Gavalik*, 812 F.2d at 862.

## VI.

*Propriety of Injunctive Relief on a Nationwide Basis.*

■ Continental maintains that the district court erred by issuing an overly-broad, nationwide "obey the law" injunction and by not requiring the individual claimants to prove any causal relationship between the corporate policy and the actual layoffs in order to prevail on the issue of liability. Continental confuses monetary liability for individual harm with forward-looking equitable remedies.

■ A plaintiff class may obtain prospective injunctive relief by showing that the challenged conduct violates section 510 of ERISA. Where an equitable remedy is concerned, causation need not be proved. *See Zipf*, 799 F.2d at 893. Once a specific discriminatory intent has been established by a preponderance of the evidence, either directly or circumstantially, a "cease and desist" injunction becomes an appropriate classwide remedy "in the absence of any rebuttal evidence from Continental that the plan was not so designed." *Gavalik*, 812 F.2d at 857. An injunction award operates separately from a money damage recovery by an individual plaintiff. Thus, the same burdens to produce and persuade germane to individual liability do not apply to the prospective relief provided by an injunction.

■ In granting injunctive relief, the court's remedy should be no broader than necessary to provide full relief to the aggrieved plaintiff. *Ameron, Inc. v. U.S. Army Corp of Engineers*, 787 F.2d 875 (3d Cir.1986), *on rehearing*, 809 F.2d 979, *cert. granted*, 485 U.S. 958, 108 S.Ct. 1218, 99 L.Ed.2d 419, *cert. dismissed*, 488 U.S. 918, 109 S.Ct. 297, 102 L.Ed.2d 264 (1988). In addition, a permanent injunction will issue only where a threat of harm exists, not just where potential harm exists. *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir.1969). A broad "obey the law" injunction will be vacated. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987); *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 373 (5th Cir.1981).

It cannot be gainsaid that Continental has employed a liability avoidance program, illegal wherever it is used. Full relief required a nationwide injunction ordering Continental to cease its use of this discriminatory LAP. We characterize the district court's order as enjoining the implementation of the LAP to preclude harm to other employees at other plants which are likewise infested by this devious scheme. *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 194–97 (3d Cir.1990) (Narrowly construing the scope of the district court injunction to test its propriety). This is not an "obey the law" injunction. It is a "do not use the LAP" injunction. It orders Continental to cease and desist from using a program which it denies it has anyway. Nevertheless, the illegal intent and nationwide structure of the LAP have

been well-documented throughout the course of this litigation. The court found that it is harmful and it does exist. This finding is not clearly erroneous.[21]

## VII.

 Continental contends in its reply brief that the district court's factual findings must be vacated because the RICO charges entitle it to a jury trial. Continental asserts that when one of two concurrently-brought claims carries the right to a jury trial, the jury's findings must govern issues of fact. Thus, it contends, when the district court bifurcated the ERISA and RICO causes of action it was bound to try the RICO case first. We need not answer this contention. When an issue is raised on appeal for the first time in a reply brief, it is generally waived. *Hoxworth*, 903 F.2d at 204–05 n. 29. The reason for the general rule is simple. Since the reply brief is the final written word from appellate parties without leave of the court, R.App.P. 28(c), it would be manifestly unfair to permit an appellant to interject issues to which the appellee cannot now respond. Appellants give us no reason to deviate from the general rule.[22]

## VIII.

## CONCLUSION

The plaintiff class' direct smoking-gun evidence established that Continental's LAP is prohibited conduct and purposely interfered with plaintiff's rights. Once the steelworker class proved that the LAP was a determinative factor in layoff decisions at 73 St. Louis, Continental's only defense rested on proof of same-loss; in other words, that the plaintiffs individually and collectively would have lost their jobs in the absence of the LAP. Because Continental's proof of same-loss through declining business volume could not be separated from the discriminatory LAP, the district court rejected the defense and entered judgment for the plaintiff class.

The failure of Continental's same-loss defense at 73 St. Louis inured to the benefit of all class members there. In addition, the district court's finding of discriminatory intent acts as a presumption in favor of *all* class members, regardless of whether the members worked at 73 St. Louis, and allows this court to permanently enjoin the

---

**21.** Although he agrees that some form of injunctive relief is warranted, Judge Becker believes that the district court's order enjoining Continental from "continuing to implement any aspect of the liability avoidance plan, is in fact a nationwide 'obey the law' injunction which must be set aside as unacceptably broad and impermissibly vague." *See e.g., Calvin Klein Cosmetics, Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir.1987); *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 373 (5th Cir.1981). Judge Becker believes that the district court needed to describe, with more specificity, exactly what elements of the plan it was enjoining. He notes that some aspects of the plan, for instance those protecting employees whose benefits had already vested, are not illegal. He therefore believes it to be possible, given the court's decision in *Gavalik* and this case, that Continental will be held in contempt for giving any consideration to pension costs when making legitimate business decisions re-

garding market demand and its workforce. Thus, Judge Becker would remand for the district court to narrow the injunction, i.e., at least to limit it to enjoining any program which is aimed at capping or shrinking a plant in order to limit pension liability.

**22.** Continental made this argument when the district court bifurcated the ERISA and RICO class actions and decided to try the ERISA action first. The district court, however, rejected the argument and Continental's attempts for mandamus review were denied by this Court. The issue was then, for all intents and purposes, dead. In order to revive it, Continental had to reference it in the notice of appeal or demonstrate the connection between this issue and the orders that were specifically appealed from and give plaintiffs an opportunity to brief the issue, *Williams v. Guzzardi*, 875 F.2d 46, 49 (3d Cir. 1989).

use of the LAP nationwide.[23]

Accordingly, we affirm.

---

**23.** A court may issue an appropriate injunction upon proof of a discriminatory plan under 29 U.S.C. § 1140.