Cecil McLENDON, et al., Plaintiffs,

v.

The CONTINENTAL GROUP, INC., et al., Defendants.

Albert J. JAKUB, et al., Plaintiffs,

v.

The CONTINENTAL GROUP, INC., et al., Defendants.

Robert GAVALIK, et al., Plaintiffs,

v.

The CONTINENTAL GROUP, INC., et al., Defendants.

Civ. A. No. 83–2864.

Civ. Nos. 83–1340 (SA) (HLS), 89–4009 (HLS) and 89–4066 (HLS).

United States District Court, D. New Jersey.

Sept. 17, 1992.

Roslyn M. Litman, Litman, Litman, Harris, Brown & Watzman, Pittsburgh, Pa., John G. Jacobs, Robert Plotkin, Plotkin & Jacobs, Ltd., Chicago, Ill., Daniel P. McIntyre, Falmouth, Me., for plaintiffs.

Stephen, Patton, Kirkland & Ellis, Chicago, Ill., for defendants.

Professor George L. Priest, Yale Law School, New Haven, Conn., Special Master.

SAROKIN, District Judge.

By two Orders dated July 23, 1992, and filed July 24, 1992, this court approved the Settlement and Plan of Distribution (hereinafter "Distribution") in this decade-old class action litigation. At page three of the Order Approving Settlement and Entering Final Judgment, the court reserved the right to file an Opinion explaining the court's reasons for approving the Settle-

ment and Distribution. What follows is the court's further justification for approving the Settlement and Distribution, as supplemented by the Court's oral remarks at the July 20, 1992 Fairness Hearing, the July 13, 1992 Report and Recommendation of Special Master George Priest Regarding the Fairness of the Settlement and the Proposed Plan of Distribution, and the July 18, 1992 Report and Recommendation of Special Master George Priest Regarding Certain Amendments to the Proposed Plan of Distribution and Summarizing Objections to the Proposed Plan of Distribution.

*Introduction*

In its previous opinions in this matter, the court has recited the facts which gave rise to the claims asserted herein. It condemned the actions of those corporate officers who systematically set about to deprive thousands of workers of their pension benefits, and now praises their successors for recognizing the harm caused and for seeking to make amends to those so deprived. It is unfortunate that it took ten years and millions of dollars of litigation expenses to reach this moment. While this litigation has labored onward, entitled claimants have suffered financially and emotionally. Some have died in the interim. The settlement will restore only a portion of their financial losses to them or their families. It can never compensate for the years of anguish they endured or for the insidious injury inflicted upon them by an employer to whom they were loyal and dedicated and in whom they and their families reposed their trust and future security.

Before addressing the fairness and adequacy of the Settlement and Distribution, the court wishes to acknowledge the extraordinary efforts of the persons responsible for bringing this litigation to a just and satisfactory conclusion.

We live in a time when criticism of lawyers abounds, but this case and these lawyers for the class belie and refute that criticism. They have labored in this and related cases for more than a decade. They persisted where others might have surrendered. They succeeded with dili-

gence and competence in the face of substantial obstacles and opposition. As a result, they have gained a substantial fund for a large class of persons who were wrongly deprived of their pension benefits and are sorely in need of the funds obtained for them.

This case and its result is a tribute to these lawyers and the entire legal profession. They will be compensated, but they worked for all of these years with the risk that they might not be. Their dedication to this cause and this class does honor to the bar, and they have the respect and admiration of this court.

This was a joint effort, however. The attorneys brought the case to a point which was a catalyst for settlement, but Professor George Priest,[1] appointed as Special Master by the court, was responsible for the extraordinary amount received in settlement and for the development of the highly complex distribution plan. The resolution of this case and the plan was his doing, coupled with the efforts and cooperation of counsel for all parties and Dr. David Wise from Harvard University. There is no conceivable way that the court could have accomplished this settlement or developed this plan without Professor Priest's efforts, and the court, on its own behalf and on behalf of counsel and the litigants, extends its thanks and appreciation to him. His dedication, creativity, and extraordinary efforts brought this matter to a satisfactory conclusion which benefitted all of the members of the class in a just and fair fashion.

Finally, there is a unique aspect to this settlement which should not go unmentioned. It formalizes and recognizes the right of employees' spouses to participate in the recovery unless they are precluded by virtue of special circumstances or by prior legal proceedings. Their participation carries out the goals and purposes of the law. It recognizes that spouses of employees have suffered derivative pension losses from these wrongful layoffs, and although not the basis for their claims, undoubtedly were required to make sacrifices as a result. Thus, they should share in the recovery for the losses sustained although the agony endured cannot be compensated.

The justification for this recognition of derivative spousal rights is due to the learned and innovative Opinion prepared by Professors John Langbein[2] and Judith Resnik.[3] They undertook a unique and novel issue, made it clear and understandable, and pointed the way to a fair and proper result.

### The Legal Standard for Approval of the Settlement and Distribution

Fed.R.Civ.P. 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class, in such manner as the court directs." Specifically, the court must assess "whether the settlement is fair, adequate, and reasonable." *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118 (3d Cir.1990), quoting *Walsh v. Great Atlantic and Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir. 1983). As described in the Manual for Complex Litigation (Second):

> In determining whether a class settlement should be approved, the court must decide whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued. The settlement must be fair, reasonable, and adequate under the circumstances. In cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement. The defendant's inability to pay a greater amount

---

1. John M. Olin Professor of Law and Economics and Director, Program in Civil Liability, Yale Law School.

2. Chancellor Kent Professor of Law and Legal History, Yale Law School.

3. Orrin B. Evans, Professor of Law, University of Southern California Law Center.

may be an important factor, as may the need of the plaintiff's for immediate relief.

MCL 2d § 30.44, at 242 (1985).

The Third Circuit Court of Appeals has specified several factors which courts in this circuit must consider when evaluating the fairness, adequacy, and reasonableness of a proposed settlement. They are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all of the attendant risks of litigation.

*Stoetzner, supra,* 897 F.2d at 118, citing *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975). *See also* W. Schwarzer, *Managing Antitrust and Other Complex Litigation* 188 (1982) (setting forth similar factors on which the court should make findings); H. Newberg, *Newberg on Class Actions* § 11.-42, at 454 (2d ed. 1977) (same); *see generally, In re Agent Orange Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y. 1984), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988).

The Special Master's July 13th and July 18th Reports recommend the approval of the Settlement and Distribution. In those Reports, the Special Master has detailed the many reasons why the Settlement and Distribution are fair, adequate, and reasonable, with special attention to each of factors discussed in *Stoetzner.* This court has already adopted the recommendations contained in these Reports, *see* 7/23/92 Order Approving Settlement and Entering Final Judgment at ¶¶ 13–14, and the court will not restate the exhaustive detail and sound justifications contained therein. Rather, by way of this Opinion, the court hopes to highlight the particularly salient aspects of this litigation which convince the court that the Settlement and Distribution fairly, adequately, and reasonably compensate the class for the harm which it has suffered.

### The Settlement

 Any consideration of the Settlement in this case must begin with an appreciation of the extensive factual and procedural background of this litigation. As detailed in this court's June 7, 1989 Amended Opinion, reprinted at 749 F.Supp. 582 (D.N.J. 1989),[4] plaintiffs brought this class action pursuant to Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140 (1982) which provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

Plaintiffs alleged that the defendants had engaged in a scheme to deprive employees of their so-called "Magic Number" pre-retirement benefits, which vested employees would collect in the event of layoff. Defendants faced a declining market for their product and recognized that imminent layoffs would expose them to extensive pension liabilities. Accordingly, defendants developed a Liability Avoidance Program, whose central feature was the BELL computer program which targeted unvested employees for dismissal and tracked those employees in order to prevent their inadvertent recall.

Defendants denied the existence of the Liability Avoidance Program, contended that the Liability Avoidance Program did

---

**4.** *See also* 908 F.2d 1171 (3d Cir.1990) (affirming June 15, 1989 Order implementing district court's June 7, 1989 Amended Opinion).

not guide their employment decisions, and argued that even if it did, the layoffs were inevitable given the economic climate.

Plaintiffs claims were originally filed as two separate suits, *Gavalik v. Continental Can Co.*, Civ. No. 81–1519, filed in 1981, and *Jakub v. Continental Can Co.*, Civ. No. 82–1995, filed in 1982, which cases were consolidated in 1984 and certified as a single class action. *Gavalik* and *Jakub* concerned Continental's Plants 72 and 478 Pittsburgh. The district court for the Western District of Pennsylvania bifurcated the liability and damages phases of the trial, and in 1985, the court conducted the liability phase of the trial and entered judgment for the defendants. The plaintiffs appealed, and defendants cross-appealed, arguing that plaintiffs' action was barred by virtue of the statute of limitations and plaintiffs' failure to exhaust their administrative remedies. In 1987, the Third Circuit rejected defendants' arguments and reversed the judgment of the district court. The Court ruled that the Liability Avoidance Program as implemented at the Pittsburgh plants did violate ERISA. *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.1987), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492. However, the Circuit also held that the defendants were entitled to their day in court on the "same loss" defense, but that defendants bore the burden of persuasion. *Gavalik*, 812 F.2d at 866.

Meanwhile in 1983, another action, *McLendon v. Continental Can Co.*, 749 F.Supp. 582 (D.N.J.1989), had been filed before this court. This court granted plaintiffs partial summary judgment based on the Third Circuit's Opinion in *Gavalik*, on the ground that the defendants were collaterally estopped from relitigating issues establishing ERISA liability. *McLendon v. Continental Group, Inc.*, 660 F.Supp. 1553 (D.N.J.1987). However, consistent with the *Gavalik* Opinion, defendants were entitled to a trial on their same loss defense and damages issues. In 1989, this court conducted a "test" trial on the "determina-

tive factor" issue and the applicability of the "same loss" defense with regard to the individual Continental plant which employed the largest number of claimants, Plant 73 St. Louis. After a lengthy bench trial, the court entered judgment in favor of the plaintiffs and granted plaintiffs nationwide permanent injunctive relief. *McLendon*, 749 F.Supp. 582.[5] Defendants appealed, and the Third Circuit affirmed the district court. *McLendon v. Continental Can Co.*, 908 F.2d 1171 (3d Cir.1990). However, the Circuit again made clear that defendants were entitled to a trial on the same loss defense for each of the forty-plus Continental plants. *Id.* at 1181. Thus, while plaintiffs had eventually prevailed at each step of the litigation, there was no end in sight for the litigation.

In addition to the same loss defense, plaintiffs faced other obstacles before the class might enjoy some, if any, recovery. The court had previously bifurcated plaintiffs claims, reserving for subsequent trial plaintiffs' RICO claims. At the time of settlement, the parties estimated a trial period of two years on these claims. Moreover, defendants insisted that they were entitled to individual trials on damages for each of the five thousand-plus potential class members.

Thus, the complexity, expense, and likely duration of this litigation were truly immeasurable. At the time of settlement, although plaintiffs had won a legal and moral victory, in a sense, these were only preliminary steps towards any ultimate recovery on behalf of individual class members. Plaintiffs faced the risk of perhaps not being able to establish liability for certain Continental plants, and every individual class member faced the risk of failing to establish individual damages. Given these uncertainties and the prolonged delay that further litigation necessarily entailed, the court fully concurs with counsel's assessment that settlement at this juncture best serves the interests of the class.

---

**5.** On October 30, 1989, *Gavalik* and *Jakub* were transferred to this court and consolidated with *McLendon* for administrative purposes.

This is confirmed by the fact that with a class composed of approximately five thousand individuals, not a single class member has objected to the settlement. Although some class members have expressed dissatisfaction with their individual awards (*see infra* regarding the Plan of Distribution), not a single class member has opposed the Settlement on behalf of the class. Indeed, since the announcement of the settlement at the end of 1990, not a month has gone by that this court has not received either a telephone call or a letter from a class member, detailing the suffering and deprivation which these individuals have endured as a result of the harm done to them. These communications invariably expressed the need for prompt compensation given the disruption that has affected their lives since layoff from Continental.

But the risk and delay of further litigation would not justify this settlement were it not for the extraordinarily large sum obtained by the plaintiffs. Although some class members may ultimately receive less than if their claims were fully and successfully litigated, the considerable size of the settlement fund assures that all class members will receive immediate compensation, and that most will receive quite large and generous awards.[6] As for those who will receive less than their actual losses, as stated above, the court has not received a single objection to the settlement offer itself. Thus, these objections go to the Plan of Distribution and are discussed *infra*.

Other objections note that according to the settlement agreement, attorney's fees and taxes are to be drawn from the negotiated lump sum, whereas ERISA provides for payment of attorneys' fees by the unsuccessful defendants. However, counsel for the plaintiffs specifically took these anticipated costs into account prior to accepting any settlement offer. Thus, these additional expenditures figured as a part of the overall calculation.

Finally, the sum of $415 million is sufficiently large to have a punitive impact on these individual defendants, as well as to serve as deterrent force should any employers consider similar illegal conduct in the future. By commanding such a substantial sum in settlement, plaintiffs have effectively confirmed and concluded their legal and moral victories.

Notwithstanding the obvious fairness, adequacy, and reasonableness of the settlement, the court is not without its misgivings. Certain persons have been denied the right to participate in the settlement because they fail to meet the class definitions which have structured this case. However, the class in this matter has been clearly defined for a considerable period of time, and the case was settled based upon that definition. No application was ever made to intervene in this matter until after the case was settled. The reasons for the denial of the applications for intervention have been set forth in previous opinions and have been affirmed by the Court of Appeals. The court again reaffirms its previously expressed finding that the Settlement Class as defined in the Settlement Agreement is reasonable, proper, and in accordance with the applicable law. *See* July 23, 1992 Order Approving Settlement and Entering Final Judgment at ¶ 7, pps. 6–8.

The court is not unmindful of the disappointment and anger of those whose claims have been denied. This has not been an easy matter for the court or for counsel. However, the expansion of the class would have substantially diminished the recovery of those originally and properly included. No matter how much we all would have wished to satisfy everyone's claim, neither the circumstances nor the law permitted it. In addition, the court takes comfort in the fact that, as the proposed intervenors and the defendants have conceded, the proposed intervenors are not precluded by virtue of this settlement from seeking their own recovery.

Therefore, for the foregoing reasons, the court specifically finds that the Settlement

---

**6.** For instance, as calculated in the Special Master's July 13, 1992 Report and Recommendation, only 2.6% of the class will receive less than $2000. However, 47.4% will receive between $10,000 and $50,000, and 39.65% will receive over $50,000. 7/13/92 R & R at 40.

previously approved in this court's July 23, 1992 Order is fair, adequate, and reasonable.

### The Plan of Distribution

■ As suggested *supra*, the court has received objections from individual class members regarding the proposed Plan of Distribution. As detailed in this court's July 23, 1992 Order Approving Plan of Distribution, as well as the Special Master's July 18, 1992 Report and Recommendation Regarding Certain Amendments to the Proposed Plan of Distribution and Summarizing Objections to the Proposed Plan of Distribution, several of these objections have since been incorporated by consent into the Distribution. In addition, as explained by counsel for plaintiffs and the Special Master at the July 20, 1992 Fairness Hearing, as well as in the Special Master's July 18th Report, the remaining objections are generally without merit.

The court has reviewed all of the letters forwarded to the court, some praising the proposed Plan of Distribution and others criticizing it. Most of the objections involve personal complaints regarding the estimated amount of individual awards.

With the large number of persons involved in this case, it would have been impossible and taken years to consider all of the circumstances of each individual. (Indeed, as described *supra*, the desirability of avoiding such a scenario was a major impetus towards the Settlement itself.) For instance, some of those who will receive less because they sought and obtained other employment, either from Continental or elsewhere, complain about those who may not have looked as hard for work and may even have refused employment. But it would have been impossible to determine who tried diligently to find work and who did not, and then attempt to evaluate and to calculate their claims based upon those individual efforts and their respective success or failure.

By necessity, the formula ignores certain individualized factors which would increase the award for some and decrease it for others. As already mentioned, it excludes entire groups which everyone wishes could be included. But even this huge fund has its limitations, and the unwarranted expansion of the class dilutes the valid claims of all those clearly entitled to participate.

There has been an extraordinary effort to be fair and to develop uniform criteria which could be applied in a practical fashion. Some may receive too much, some may receive too little, and some unfortunately will receive nothing at all, even though they believe in good faith that they are entitled to participate. But the goal here is fairness, not perfection which cannot be achieved.

The court is satisfied that the Plan of Distribution is fair and reasonable. The court is especially impressed by the manner in which the Distribution calculates an award based on factors of particular relevance to the ERISA cause of action which gave rise to this lawsuit: years of service, closeness to vesting, ability to vest, years to retirement, and earnings experience after leaving Continental.

Fairness also requires the Distribution to include provisions securing the rights of class members' current and former spouses. The Report prepared by Professors Langbein and Resnik sets forth the spousal interests under ERISA and how they are at issue in this litigation, persuasively explaining that any Distribution must take account of these spousal interests if it is to be approved. The difficulty in this case was that, because defendants' conduct allegedly defeated the spousal pension accruals that Congress mandated in the Retirement Equity Act of 1984, 29 U.S.C. § 1055 (amending ERISA section 205), the precise mechanism which Congress devised for implementing spousal interests was unavailable. to the non-employee spouses in this case.

Because ERISA guarantees a survivorship annuity to the spouse of a vested employee, 29 U.S.C. § 1055, spouses of class members also suffered damages as a result of the employee's lost potential to vest for a pension. Although ERISA does not create any federal property rights for divorced spouses, ERISA does respect

state law distributions of marital property. The Special Master has already notified divorced spouses of their former spouse's anticipated award in order to enable spouses to secure their state property rights, if any.

### Procedural Fairness

The July 23, 1992 Order Approving the Settlement and Entering Final Judgment details the full history of class notices and hearings, and the court need not repeat that history here. 7/23/92 Order at ¶¶ 8–12, pps. 8–10. The court does note that the class members have been fully and fairly apprised of their rights throughout these proceedings, and the court is not aware of any complaints in this regard. Again, the court is indebted to Professor Priest and his diligent efforts to provide class members with adequate and efficient notice.

The court also wishes to note the Special Master's assurance that the negotiations leading up to this Settlement were conducted at "arm's length." *See In re Agent Orange Litigation, supra,* 597 F.Supp. at 762 (court must focus on absence of collusion in settlement negotiations, in addition to whether interests of all class members were adequately considered). In fact, the Special Master facilitated the negotiations, and the parties did not engage in face-to-face negotiations. 7/13/92 R & R at 22. There is no question that the settlement was reached without corruption or collusion. To the contrary, counsel have ceaselessly and vigorously defended the rights of the class throughout the settlement negotiations and the ensuing negotiations to arrive at an acceptable plan of distribution.

### Conclusion

Based on the foregoing considerations, this court previously and here again approves the Settlement and Distribution in this case.