Cecil McLENDON, et al., Plaintiffs,

v.

The CONTINENTAL GROUP, INC., et al., Defendants.

Albert J. JAKUB, et al., Plaintiffs,

v.

The CONTINENTAL GROUP, INC., et al., Defendants.

Robert GAVALIK, et al., Plaintiffs,

v.

The CONTINENTAL GROUP, INC., et al., Defendants.

Civ. Nos. 83–1340 (SA) (HLS), 89–4009 (HLS) and 89–4066 (HLS).

United States District Court, D. New Jersey.

Dec. 16, 1994.

---

Roslyn Litman, Litman Litman Harris and Brown, P.C., Pittsburgh, PA.

John Jacobs, Plotkin & Jacobs, Ltd., Chicago, IL.

Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA.

Prof. George L. Priest, Sp. Master, Yale Law School, New Haven, CT.

## AMENDED OPINION

SAROKIN, Circuit Judge.[1]

### Introduction

In matters in which the court is permitted by statute to award attorneys' fees, the amount of the award must serve varied and multiple purposes. Counsel who have served and succeeded should be reasonably compensated. The award should serve to induce and encourage other counsel to undertake similar cases. The unsuccessful party should be required to pay such fees in order not to reduce the plaintiffs' award. The compensation received by plaintiffs should make them whole to the extent possible and should not be diminished by the expense of obtaining it. Litigants without the financial resources should have the means to pursue valid claims. The method and formula for determining such fees should be accomplished with the least possible expense and judicial time. And finally, the amount of the award should promote public confidence in the judicial system. It should not be viewed as a windfall to lawyers, but rather as just and reasonable compensation for the time spent, the delays encountered, the risks assumed, and the results obtained.

This court is in the unique position of having been chair of the Third Circuit Task Force on Court Awarded Attorney Fees, *see* 108 F.R.D. 237 (1985), cited frequently by the Special Master and all counsel. Many of the conclusions contained in that report are applicable here.

Initially the Task Force enumerated the deficiencies of the lodestar method of calculating fees. It has created satellite litigation and necessitated time-consuming review of billing records and other documentation. It is virtually impossible for a court in retrospect to determine what work was necessary or reasonable. In this matter the court has had the extraordinary assistance of the Special Master. However, the problem exists even if it is delegable.

The awards are frequently inconsistent and lack uniformity. Determining market or customary rates is difficult, inefficient, and time-consuming. Most significantly, payment based upon the number of hours devoted discourages early settlement and encourages abuses and unnecessary work. Finally, there is a substantial lack of predictability, leaving counsel uncertain as to how they will be compensated. This case is a prime example of that uncertainty.

Undoubtedly aware of the foregoing litany of problems arising from the use of the lodestar method, the United States Supreme Court in *City of Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), nevertheless has recently reaffirmed its applicability in statutory fee cases and has virtually precluded enhancement for the risks undertaken by counsel. Plaintiffs' counsel argue that this ruling has no applicability to common fund cases; that this is a common fund case; and thus they are entitled to enhancement or a percentage of the fund compensating them for the success achieved and the risks endured.

It is undisputed that defendants faced liability for statutory fees and that the amount paid in settlement included, in part, payment for that potential liability, but not allocated as such. Indeed, any such allocation might be unethical and would be subject to court review and approval in any event. The primary issue before the court is whether the *Dague* restrictions apply under these circumstances. Should plaintiffs' counsel be enti-

---

1. Honorable H. Lee Sarokin, United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation.

tled to a larger fee if it is the plaintiffs, in effect, who are paying it rather than the defendants? The court believes that the answer to that question is in the affirmative.

In a statutory fee case, by requiring the defendant to pay fees, the plaintiff is made whole and the recovery is not diminished by the expense incurred in obtaining it. If risk of success were factored into the calculation, the stronger the defense—the greater the fee. Thus, a defendant who had a greater justification for defending a case would be penalized more than one who had no or a weak defense. Thus, with considerable justification the Supreme Court has reasoned that the risk undertaken by plaintiff's counsel should not be assumed or compensated by the unsuccessful defendant. However, no like concerns exist when the compensation is paid by the plaintiff, even though the original source of the fund comes in part from the settlement of the statutory fee claim.

To apply the same rule to plaintiffs would infer an agreement by lawyers to work for nothing if they did not succeed, and be paid only for their time, if they did. To the extent possible a fair and reasonable fee should replicate the marketplace. It is difficult to envision any lawyer agreeing to such a bad bargain.

No one could review the record in this case and help but conclude that the risks were monumental, the dedication and sacrifice of counsel heroic, the quality of performance superb, and the result extraordinary. It is inconceivable to this court that the Supreme Court or Congress intended that after a decade of toil on behalf of this class, counsel should receive compensation solely predicated upon the time devoted without recognition of the risks undertaken, the sacrifices endured and the exceptional result achieved.

Thus, in the court's view, all that remains is to determine how those factors are to be compensated. The Special Master makes the unique and intriguing suggestion that different enhancement should apply to different time periods—that the multiplier should diminish as the risk diminished. That suggestion has great appeal, since a substantial amount of the work in this matter was performed when the risk of no recovery was

minimal. However, until the settlement was consummated, the amount of recovery was very much at risk. Furthermore, the risk, if any, in trying to replicate the marketplace, should be determined from the outset. Counsel would not have the right to withdraw except in unique circumstances, no matter in what direction the litigation progressed. In any event, the court is satisfied that plaintiffs' counsel are entitled to enhancement at least until the moment of settlement and to their average historic rates plus interest thereafter in implementing the settlement.

The Third Circuit Task Force strongly recommended the negotiation of a contingent fee at the outset of the litigation with the class represented by independent counsel for that specific purpose. The agreement would be subject to court approval. Such an arrangement would have the obvious advantage of avoiding the calculation and determinations that the lodestar formulation requires. That avenue was not pursued here, because the Report did not exist at the time this action was instituted.

The question remains whether the court should attempt to arrive at a percentage in retrospect, recognizing that all risks have been resolved and the ultimate recovery is known. The obvious difficulty with such an approach is that it is virtually impossible to envision what agreement the parties would have made a decade ago. Furthermore, with the facts now known, a court may simply adjust the percentage to arrive at a gross fee which the court deems to be fair and reasonable under all of the circumstances. (The same risk, of course, also applies in the choice of a multiplier.) Because plaintiffs' counsel has requested that the court fix a percentage, the court will consider the practicability of this method and its usefulness as a check against the multiplier. However, the order of the court will be based upon the lodestar and multiplier.

Before the court is the Report of the Special Master Concerning Fees to the Attorneys for the Class, and the objections of the petitioners and the intervenors to that Report. Having discussed the general parame-

ters which must guide the court's consideration of these matters, the court will address the specific recommendations and the objections thereto.

## I. Background

The factual and procedural background of this litigation is set forth in this court's previous opinions in this matter. *See e.g., McLendon v. Continental Group,* 802 F.Supp. 1216 (D.N.J.1992); *McLendon v. Continental Group,* 749 F.Supp. 582 (D.N.J.1989). Briefly, this complex class action litigation began with the filing of a number of class actions across the country, among them *Gavalik v. Continental Can Co.,* filed in 1981; *Jakub v. Continental Can Co.,* filed in 1982; and *McLendon v. Continental Group,* filed in this district in 1983. These cases were all based upon the same general allegation that Continental Can Co. operated a "liability avoidance plan" to prevent employees from becoming eligible for employee benefits, in violation of § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Two trials were conducted, both followed by appeals. In 1987, the United States Court of Appeals for the Third Circuit held that Continental Can had implemented its Liability Avoidance Plan at Plants 72 and 478 Pittsburgh in violation of ERISA. *Gavalik v. Continental Can Co.,* 812 F.2d 834 (3rd Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). In 1989, the Third Circuit Court of Appeals affirmed this court's ruling that Continental Can's Liability Avoidance Program was the determining factor in the layoffs of 315 class members in the *McLendon* suit who were employed at defendant's 73 St. Louis plant. *McLendon v. Continental Can Co.,* 908 F.2d 1171 (3rd Cir.1990).

The *McLendon, Gavalik,* and *Jakub* cases were consolidated in this district in 1989. In July, 1989, this court appointed Professor George L. Priest of the Yale Law School as Special Master to assist the parties in the settlement of damage claims and remaining issues. In July, 1992, the court approved the Settlement and Distribution Plan the parties had negotiated. *McLendon,* 802 F.Supp. at 1222–23. Pursuant to the settlement, defendants paid over $400 million into a Settlement Fund, extinguishing all liability with respect to all claims. Thus, the Settlement Fund is responsible for payment of all fees to the class attorneys.

After many years of involvement with this complex litigation and its settlement, the court now turns its attention to the compensation of the attorneys who have labored so long in the representation of the plaintiff class. In 1992, those attorneys filed two fee petitions: that of Plotkin & Jacobs, Ltd. ("Plotkin firm"), attorneys for the *McLendon* class, and that of Litman Litman Harris and Brown ("Litman firm"), counsel for the *Gavalik* and *Jakub* classes. Other attorneys who worked on behalf of the class at various times have submitted their requests for fees through these two petitions. The United Steelworkers of America (USW) has intervened on its own behalf and on behalf of 61 class members (the "intervenors"), in opposition to the petitions.

The fee petitions were referred to the Special Master (the "Master") for a report and recommendation as to their disposition. On July 19, 1994, the Master submitted to the court the Report Concerning Fees to the Attorneys for the Class (the Report). Thereafter, the petitioners and the intervenors submitted their objections to the Report. Extensions were granted to allow further submissions.

## II. Standard of review

■ Pursuant to Rule 53(e) of the Federal Rules of Civil Procedure, the Master's factual findings are entitled to deference and will be accepted unless they are clearly erroneous. Fed.R.Civ.P. 53(e)(2); *Kyriazi v. Western Electric Co.,* 647 F.2d 388, 396 (3rd Cir.1981). "A district court's review of the master's proposed conclusions of law, however, is plenary." *Apex Fountain Sales v. Kleinfeld,* 818 F.2d 1089, 1097 (3d Cir.1987). *See also Monmouth County Correctional Institution Inmates v. Lanzaro,* 695 F.Supp. 759, 761 (D.N.J.1988).

The Report and the various objections submitted raise a number of factual and legal

questions. Although the central issue before the court is the legal question of whether restrictions applicable in statutory fee cases apply here, the court will first address the preliminary factual question of whether a contract existed with regard to the *McLendon* fees.

### III. The Existence of a Contract

■ At the outset, the court must address the intervenors' claim that the USW, through its general counsel Bernard Kleiman, reached an express contract with Robert Plotkin on October 19, 1982 regarding representation in the nation-wide *McLendon* litigation, and that this contract governs the Plotkin firm fee petition. The USW claims that Mr. Plotkin agreed not to seek compensation on the basis of a percentage of any recovery, and that the USW would have authority to approve any fee request in advance. Declaration of Bernard Kleiman of Sept. 4, 1992, at ¶ 28 (hereinafter "Kleiman Dec."). As evidence purporting to show the existence of this agreement, the USW proffers Mr. Kleiman's notes taken during a meeting on October 19, 1982; its claim that the USW maintains a policy prohibiting percentage contingency awards for outside counsel; and statements by various USW officials following the settlement of the litigation. *See* Kleiman Dec.; Report at 5.

Although accepting the authenticity of Mr. Kleiman's notes and the existence of a USW policy against percentage contingency agreements with outside counsel, the Master found that no contract existed with the Plotkin firm with respect to fees for this litigation. Report at 6. The Master concluded that an agreement of great consequence intended to bind the parties far into the future must be memorialized with a firmer expression of the intent of both parties than can be gleaned from the notes taken unilaterally by one of the parties without acknowledgement by the other. In addition, the Master considered relevant the absence of any allegation of a similar agreement with Litman firm regarding fees for the *Gavalik/Jakub* litigation. Report at 5–6.

The intervenors object to the finding that no contract existed regarding the *McLendon* fees. Intervenors Objections to, and Motion to Accept in Part, The Special Master's Report (hereinafter "Intervenors Obj.") at 9–14. The USW argues that it would have had no difficulty in finding other competent outside counsel who would have agreed to take the case on the condition that counsel agree not to seek fees based on a percentage of the recovery. Intervenors Obj. at 11; Kleiman Dec. at ¶¶ 13, 25–26, 31–32; Declaration of USWA Associate General Counsel Carl Frankel, ¶¶ 10–11. Further, the intervenors argue that the Master's conclusion that the evidence they present is insufficient to prove the existence of the alleged contract is based on a misapprehension of the law of contracts. Intervenors Obj. at 12.

Specifically, the intervenors rely on the principle that a party may be held to have agreed to orally presented terms where that party subsequently acts consistently with the acceptance of those terms. *See Ponzoni v. Kraft General Foods, Inc.*, 774 F.Supp. 299, 315 (D.N.J.1991), *aff'd*, 968 F.2d 14 (3rd Cir. 1992) (when acceptance is by conduct, the court must look to the objective circumstances rather than the subjective intent of the party); *Project Development Group, Inc. v. O.H. Materials Corp.*, 766 F.Supp. 1348, 1352 (W.D.Pa.1991), *aff'd*, 993 F.2d 225 (3rd Cir.1993) (existence of oral contract is a question of fact). The intervenors argue that the fact that Mr. Plotkin accepted the case without specifically repudiating the conditions Mr. Kleiman stated is sufficient to bind Mr. Plotkin to those conditions. Intervenors Obj. at 12. However, the intervenors submit no objective evidence that Mr. Plotkin knew or understood that he was binding himself to the specific conditions Mr. Kleiman allegedly proposed. The fact that Mr. Kleiman presents notes from a telephone conversation outlining these conditions does not prove that the conditions were in fact understood and accepted by Mr. Plotkin. Nothing about Mr. Plotkin's actions in accepting the case indicates specific acceptance of these alleged terms. Therefore, the court adopts the Mas-

ter's finding that no contract existed with Mr. Plotkin as to the *McLendon* fees.[2]

■ In the alternative, the intervenors argue that the court should enforce the terms of the alleged agreement under an estoppel theory:

> Assuming Mr. Kleiman's notes are authentic, as the Special Master found, Mr. Plotkin's failure to reject Mr. Kleiman's conditions expressly, knowing that the USWA would reasonably rely on his silence as acquiescence, must estop petitioners from now disputing that those conditions are controlling.

Intervenors Obj. at 13–14 (citing *Bechtel v. Robinson*, 886 F.2d 644, 650–52 (3rd Cir. 1989) (" '[equitable] estoppel may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment' ") (citation omitted); and *Green v. Interstate United Management Services Corp.*, 748 F.2d 827, 830–31 (3rd Cir.1984) (outlining Pennsylvania law on promissory estoppel). There is no evidence that the intervenors relied upon any promise made by Mr. Plotkin. Nor is there any evidence that the intervenors performed any services in reliance on any such promises. The services performed, the reliance if any, and the change in position were all on the part of the attorneys. Promissory estoppel is meant to protect those who rely and act based upon an oral promise, not the promisor. Accordingly, the court accepts the Master's finding that no contract existed, and declines to enforce the terms the intervenors allege on the basis of an estoppel theory.

### IV. Intervenors' Motion to Strike Affidavits

By motion dated August 5, 1994, the intervenors request the court to strike statements contained in affidavits supplementing the petitioners' objections to the Master's Report[3]

and ask that the parties be afforded an opportunity to respond to the objections. The statements describe comments allegedly made by the Master on March 8, 1994 and May 26, 1994 in discussions concerning the award of fees.

Intervenors maintain that the alleged statements are untimely, irrelevant, and inadmissible under F.R.E. 408 (statements during settlement discussions) and 801 (hearsay), and that discussions of a specific award of fees was not disclosed to the class before the Fairness Hearing.

The court's disposition of the fee petitions does not rely on statements allegedly made in settlement discussions as to the anticipated fees, and thus, the issue is moot.

The motion to strike is denied. Intervenors' request for an opportunity to respond to the objections is also denied.[4]

### V. The Statutory Fees/Common Fund Distinction

The threshold legal issue is whether the instant petitions are more appropriately characterized as ones for statutory fees or for a common fund fee award. This issue depends on whether the underlying proceeding is a "statutory fees" or "common fund" case. The distinction is important because different considerations inform the determination of a reasonable fee in these two types of cases. A brief review of the development of the two types of fee awards and the different considerations applicable to each provides helpful background for the court's analysis.

### A. Fee Awards in Common Fund and Statutory Fee Cases

Traditionally, litigants in the United States have borne their own legal fees. However, courts began to develop exceptions to this

---

**2.** The intervenors also argue that the plaintiff class is an intended third-party beneficiary to the alleged agreement, and they urge the court to enforce the alleged agreement for the benefit of the class. Because the court accepts the Master's finding that there was no agreement, the court need not further address this argument.

**3.** The statements appear in the Third Affidavit of Robert Plotkin (July 18, 1994), Third Affidavit of John Jacobs (July 18, 1994), Third Affidavit of Daniel P. McIntyre (July 18, 1994), and Affidavit of Roslyn M. Litman (July 18, 1994).

**4.** The court notes that all parties have waived an opportunity for further comment on the Master's Report.

"American Rule," drawing on their equitable powers. *See Alyeska Pipeline Service Co. v. Wilderness Soc.*, 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). For more that a century, courts have exercised their equitable powers to award fees to attorneys from common funds they created, obtained, preserved or increased for the benefit of others. *See Trustees v. Greenough*, 105 U.S. 527, 536, 26 L.Ed. 1157 (1882); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939). This type of "common fund" award was meant to prevent the unjust enrichment of those who benefitted from the fund at the expense of those who helped create it or made it available. *See Greenough*, 105 U.S. at 536; *Task Force Report*, 108 F.R.D. at 241.

The other major exception to the American Rule arises where plaintiffs prevail in cases brought under statutes that specifically grant to successful plaintiffs the right to recover their reasonable attorney's fees from the defendant. Such statutory fee-shifting provisions became increasingly popular after the Supreme Court limited the power of courts to award fees to attorneys who brought cases intended to vindicate important public interests under a "private attorney general" theory. *See Alyeska Pipeline, supra; Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983) (noting the existence of over 150 federal fee-shifting provisions).

Many cases in which courts were called upon to make reasonable fee awards were class actions such as this one. In determining the amount of a reasonable fee, most courts relied heavily on the size of the fund obtained or the amount of benefit produced for the class, which often resulted in strikingly large fee awards. *Task Force Report*, 108 F.R.D. at 242. The Third Circuit proposed an alternative to the percentage approach in *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir.1973) ("*Lindy I*"), which described the now familiar "lodestar" method in which a court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate for the attorney(s). This "lodestar" amount may then be increased or decreased based upon features of the particular case, such as the degree of contingent risk. The Fifth Circuit proposed a different alternative involving the evaluation of 12 factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), including the time and labor required; novelty and difficulty of the legal questions; the preclusion of other employment by the attorney due to acceptance of the case; whether the fee is fixed or contingent; the amount involved and the results obtained; and other factors.

The United States Supreme Court endorsed the *Lindy* approach in statutory fee-shifting cases, noting that the lodestar provides "an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). *See also Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (in fee-shifting case, lodestar is "presumed to be the reasonable fee"). In the years since it has become popular, however, problems with the *Lindy* method have surfaced. As stated at the outset of this opinion, the Third Circuit Task Force outlined many criticisms of the *Lindy* approach, including the charge that it requires more work from the already overtaxed judicial system; that its elements are insufficiently objective; that it produces widely disparate results; that it creates an unwarranted impression of mathematical precision; that it is subject to manipulation; that it leads to certain abuses, such as excessive hours spent on tasks and duplicative work; that it creates a disincentive to settle early, and deprives courts of the discretion to structure awards so as to encourage desirable objectives such as early settlement; that it works to the disadvantage of the public interest bar because lodestar figures tend to be set much higher in securities cases and the like than in cases promoting social objectives such as civil rights; and that despite the apparent simplicity of the *Lindy* formula, confusion and lack of predictability remain in its administration. *Task Force Report*, 108 F.R.D. at 246–249. While the *Lindy* approach remains the starting point in statutory fee cases, the Task Force recommended a return to the

percentage-of-the-fund approach in common fund cases.

Since the Task Force issued its report, a number of courts have accepted its recommendation that fees in common fund cases be determined according to a percentage of the fund. *See e.g., Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) (establishing rule in Eleventh Circuit that percentage-of-fund approach rather than lodestar would apply in common fund cases); *In re Continental Illinois Sec. Litigation,* 962 F.2d 566, 572–73 (7th Cir.1992) (stating preference for percentage method); *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 526 n. 10 (1st Cir.1991) (noting that since there was no common fund, appellate court could not fault lower court's choice of lodestar method). Others have rejected the suggestion, concluding that the lodestar method should be employed in common fund as well as statutory fee-shifting cases. *See e.g., In re "Agent Orange" Prod. Liability Litig.,* 818 F.2d 226, 232 (2nd Cir. 1987). Still more have left the choice of methodology in common fund cases to the discretion of the district court. *See, e.g., Harman v. Lyphomed, Inc.,* 945 F.2d 969, 975 (7th Cir.1991); *Florida v. Dunne,* 915 F.2d 542, 545 (9th Cir.1990); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). Some courts have held that even if a common fund is produced in a case that originated under a fee-shifting statute, courts still may use a percentage-of-the-fund approach. *See County of Suffolk v. Long Island Lighting Co. ("LILCO"),* 907 F.2d 1295, 1327 (2d Cir.1990); *Evans v. Evanston,* 941 F.2d 473, 479 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). *See generally* Alan Hirsch and Diane Sheehey, *The Award and Management of Attorneys' Fees in the Federal Court,* Federal Judicial Center (1993).

Neither the United States Supreme Court nor the Court of Appeals for the Third Circuit has held that courts must utilize a particular methodology in determining appropriate common fund awards. *See Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1267 (D.C.Cir. 1993); *In re U.S. Bioscience Sec. Litig.,* 155 F.R.D. 116, 117–118 (E.D.Pa.1994). Therefore, if this case is a common fund case, the court has the authority to utilize either the lodestar method or the percentage-of-the-fund method, or some combination thereof.

No matter which method courts have employed, the question remains whether rules and doctrines developed in the context of statutory fee-shifting cases apply in common fund cases as well, or whether differences between the two types of awards make or should make for different rules and doctrines. It is this question which lies at the heart of the present fee dispute, and to which the court will devote its analysis. Before turning to this question, however, the court will address the preliminary question of whether the present fee petitions should be viewed as petitions for statutory fees or for an award from the common fund.

### B. Characterization of the McLendon Litigation

The Master concludes that "[t]he *McLendon/Gavalik* litigation is a statutory fee case." Report at 23. He reaches this conclusion on the basis that the cases were originally brought under federal statutes containing fee-shifting provisions,[5] and because the lump sum settlement included an amount intended to cover plaintiffs' attorneys' fees. *Id.* at 23–25. Indeed, the Master reasons that because the Settlement Agreement specifically incorporates a shifting of attorneys' fees that mirrors the statutory provisions, this case must continue to be viewed as a statutory fee-shifting case, despite its settlement for a lump sum. *Id.* at 25.[6]

---

5. The plaintiffs asserted claims under the Employee Retirement Income Security Act of 1974 as amended, 29 U.S.C. §§ 1001 *et seq.* (ERISA) and the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1961 *et seq.* (RICO).

6. The Master further concludes that even if the settlement converted the case into a common fund case, the Supreme Court's holding in *Dague* and related policy considerations counsel against such a classification. Because the latter argument more directly addresses whether the *Dague* restriction should apply no matter how this case

■ Petitioners vigorously dispute the Master's conclusion as to the characterization of this litigation. They maintain that the litigation must be viewed as a common fund case, for the simple reason that a common fund exists, even though the case was originally brought under fee-shifting statutes. Objections to Report of the Special Master, Litman firm (hereinafter "Litman Obj.") at 4–8; Objections to Report of the Special Master, Plotkin firm (hereinafter "Plotkin Obj.") at 14–15.

Although the court appreciates the force of the Master's arguments with respect to whether the principles of fee-shifting cases should apply in this case, and addresses those arguments below, petitioners are correct with respect to the characterization of this litigation. The Third Circuit Task Force specifically anticipated the common situation presented here, where a statutory fees case settles for an amount meant to extinguish all claims against the defendant, including claims for attorneys' fees. *Task Force Report*, 108 F.R.D. at 255. It observed that "most fund-in-court cases start as statutory fee cases," and that where such cases settle for a single sum of money,

> [T]his type of a lump-sum settlement does have the effect of creating a fund-in-court situation, even when the case may have been instituted in a statutory fee context, thereby imposing on the court the responsibility of assuring the equitable division of the fund between its beneficiaries and the attorneys.

108 F.R.D. at 269. In an ERISA class action that settled for a lump sum, the United States District Court for the Middle District of Alabama recently addressed precisely this issue:

> It is well settled that the parties to a lawsuit may negotiate a settlement according to which the defendant makes a lump-sum payment embracing both monetary relief to the plaintiff and attorney's fees liability. . . .
>
> The device of a lump-sum settlement is normally used in class action cases gov-

erned by a fee-shifting statute which, if the plaintiffs were to prevail at trial, might permit them to obtain substantial fees directly from the defendant in addition to the amount of any judgment. . . .

> A settlement like the one reached here has the effect of converting a statutory fee case into one in which plaintiffs' attorney must seek compensation from the common fund created by the agreement.

*Bowen v. Southtrust Bank of Alabama*, 760 F.Supp. 889, 892–93 (M.D.Ala.1991) (citations omitted). *See also In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 583 (3rd Cir. 1984) ("settlements releasing defendants from both damage and statutory fee liability . . . result in a fund in court from which fees [can] be awarded under the equitable fund doctrine"), citing *Lindy I*, 487 F.2d at 164–65; *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 563 (7th Cir.1994) (ERISA class action settled with creation of common fund characterized as common fund case).

Because the settlement achieved in this litigation extinguished any liability defendants might have had under the statutes for plaintiffs' attorneys' fees, the settlement converted the *McLendon/Gavalik* litigation into a common fund case, notwithstanding the fact that the causes of action arose under fee-shifting statutes.

## VI. Common Fund Fee Awards

Characterizing the instant proceeding as a common fund case does not preclude this court from seeking guidance from the reasoning of statutory fee-shifting cases, such as the ban in *Dague* on enhancement in such cases. Of particular assistance is *Florin*, 34 F.3d at 564–65, in which the Seventh Circuit declined to extend *Dague*'s prohibition on multipliers to a case which, such as this one, began as a fee-shifting proceeding under ERISA but concluded with a common fund settlement.

The court begins with a review of *Dague* and other decisions in statutory fee-shifting cases.

is characterized, the court will address it more fully in the section devoted to that question, *infra*.

## A. Dague and its Progeny

In *Dague*, the Supreme Court considered whether a court determining an award under a fee-shifting provision could enhance the award above the lodestar amount, in order to reflect the risk the plaintiffs' attorneys bore by virtue of their contingent fee agreement with the plaintiffs. —— U.S. at ——, 112 S.Ct. at 2639. The district court, in determining a fee award under the Solid Waste Disposal Act, 42 U.S.C. § 6972(e), and the Federal Water Pollution Control Act, 33 U.S.C. § 1365(d), had enhanced the lodestar by 25%, reasoning that the plaintiffs' risk of not prevailing was substantial, and that without an opportunity for enhancement, plaintiffs would have had difficulty obtaining counsel. —— U.S. at ——, 112 S.Ct. at 2640. The Court of Appeals affirmed, but the Supreme Court reversed.

The *Dague* Court began its analysis by reaffirming its "strong presumption" that the lodestar represents the "reasonable fee" promised in most fee-shifting provisions, and its view that the fee applicant who seeks enhancement must show that it is *"necessary to the determination of a reasonable fee."* —— U.S. at ——, 112 S.Ct. at 2641, citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("*Delaware Valley I*") and *Blum*, 465 U.S. at 898, 104 S.Ct. at 1548–49. The Court addressed, but did not resolve, the question of whether enhancement of the lodestar figure to account for contingency risk is ever appropriate under fee-shifting statutes in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* ("*Delaware Valley II*"), 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). In that case, Justice White, in an opinion joined by Justices Rehnquist, Powell and Scalia, determined that such an enhancement was never available under fee-shifting statutes. *Id.* at 723–727, 107 S.Ct. at 3085–88. Justice O'Connor, concurring in part and in the judgment, concluded that such an enhancement might be appropriate if the petitioner could demonstrate that absent a risk adjustment, the plaintiff would have had substantial difficulty obtaining counsel in the relevant marketplace. 483 U.S. at 733, 107

S.Ct. at 3090–91. In *Dague*, the Court adopted Justice White's suggestion in *Delaware Valley II* that enhancement for contingency risk was never available under fee-shifting statutes. —— U.S. at ——, 112 S.Ct. at 2643.

The *Dague* Court noted that enhancement for contingency "would likely duplicate in substantial part factors already subsumed in the lodestar." —— U.S. at ——, 112 S.Ct. at 2641. Risk of loss, the Court reasoned, is the product of two factors: the legal and factual merits of the claims, and the difficulty of establishing those claims. The second factor is reflected in the lodestar itself through the number of hours spent on the case, or in the higher hourly rate of an attorney especially skilled in the area of law.

The first factor, the Court reasoned, should not be reflected in the fee award, because if it were, attorneys would have "the same incentive to bring relatively meritless claims as relatively meritorious ones." —— U.S. at —— —— ——, 112 S.Ct. at 2641–42. Counsel for a plaintiff whose claim was relatively unmeritorious therefore would receive a higher contingency enhancement than would counsel for a plaintiff with a relatively more meritorious claim. The effect in the fee-shifting situation would be to reward disproportionately attorneys who bring relatively unmeritorious cases, which is not the intent behind fee-shifting provisions. —— U.S. at ——, 112 S.Ct. at 2642.

Justice White made a closely related argument in the *Delaware Valley II* opinion which the *Dague* Court adopted. He pointed out that because contingency enhancement is based on the weakness of the plaintiff's case—or conversely, the strength of the defendant's defense—contingency enhancement "penalizes the defendants who have the strongest case." 483 U.S. at 725, 107 S.Ct. at 3086. As a result, the highest fees would be authorized in the riskiest cases, thereby encouraging attorneys to bring those cases. *Id.* Moreover, because there is a risk involved in every case, *some* contingency enhancement could be justified in every case in which a plaintiff prevails. *Id.*

Both Justice White in *Delaware Valley II* and the majority in *Dague* grounded their

conclusion that risk enhancement is never available in fee-shifting cases in their interpretation of the Congressional intent behind fee-shifting provisions. The Court concluded that because contingency enhancement compensates attorneys for time spent on other cases in which they do not prevail, such enhancement under a fee-shifting provision would frustrate Congress' intent that plaintiffs recover fees only for services expended on their successful claims. 483 U.S. at 725, 107 S.Ct. at 3086–87; —— U.S. at ——, 112 S.Ct. at 2643. Thus, the *Dague* Court concluded that the contingent fee model was incompatible with the lodestar method for statutory fees. *Dague*, —— U.S. at ——, 112 S.Ct. at 2643. *See also Venegas v. Mitchell,* 495 U.S. 82, 87, 110 S.Ct. 1679, 1682–83, 109 L.Ed.2d 74 (1990) (holding that statutory fee awards under 42 U.S.C. § 1988 should not be enhanced for contingency, but that plaintiffs may contract to pay, from their own resources, in excess of the fees set by statute).

### B. Applicability of Dague

The Master concludes that the *Dague* restriction must apply to any common fund case that started as a fee-shifting case.[7] He reasons that since *Dague* clearly prohibits any risk enhancement of lodestar amounts in statutory fee cases, then allowing such enhancement in such cases that settle for a lump sum would improperly encourage plaintiff attorneys to settle for lump sums in hopes of obtaining a risk enhancement that would not otherwise be available. Thus, the Master predicts that the Supreme Court would prohibit risk enhancement of the lodestar amount even if the award came from a common fund derived from a fee-shifting case. Report at 25.

In essence, the Master contends that if different rules apply to attorneys' fees once a fee-shifting case settles, then a conflict of interest inevitably would arise between plaintiffs and their attorneys as to the course of the litigation. This court recognizes that such differential treatment may motivate class counsel to seek lump sum settlements inclusive of counsel fees thereby assuring the potential for a higher award. However, it is commonly the defendant who seeks to resolve all claims and who is unwilling to submit the issue of attorneys' fees to the court for determination. Defendants want their entire exposure resolved and wish to extinguish all claims and thus, most often, insist that any settlement include claims for fees.

Before *Dague* the district court in *Bowen, supra,* cited a similar concern in declining to employ a percentage method when awarding attorneys' fees from a common settlement fund in an ERISA case. The court concluded that because the plaintiffs' attorney would have been entitled to only his lodestar fees had the case proceeded to judgment, and because a percentage award would likely exceed this amount, the court should calculate the award using the lodestar method. *Bowen,* 760 F.Supp. at 896. Yet the *Bowen* court did not extend the argument as far as the Master would, finding instead that a fee award from a common settlement fund should be determined according to the principles of equity normally governing such awards, even if the case commenced under a fee-shifting statute, unless in a given case operation of the equitable fund doctrine would conflict with the statute at issue. *Id.* at 894.

Other courts have come to similar conclusions, finding that common fund fee awards should, in at least some instances, be governed by rules and principles developed in the statutory fees context. Since *Dague* two courts have suggested that its ban on enhancement should extend to common fund awards. A district court on remand rescinded its initial award of fees from a common settlement fund based on the lodestar plus a contingency enhancement, concluding that in light of *Dague,* it could award only the unenhanced lodestar amount. *In re Bolar Pharmaceutical Co. Sec. Litigation,* 800 F.Supp. 1091, 1092 (E.D.N.Y.1992).[8] The court concluded:

---

7. The Master prepared his report before the Seventh Circuit decided *Florin.*

8. After the district court's first award, the Court of Appeals for the Second Circuit remanded the matter for a specific articulation of the court's reasoning in awarding the risk enhancement. *In re Bolar Pharmaceutical Co.,* 966 F.2d 731, 733 (2d Cir.1992).

Although the Supreme Court has yet to address whether the limitations on multipliers propounded in *Blum, Delaware Valley I, Delaware Valley II,* and *Burlington* [*Dague*] fully apply to equitable fund cases, and although lower courts are split on the issue, this Court now holds that they do.

*Bolar Pharmaceutical Co.,* 800 F.Supp. at 1095. The court stated further that "application of the [*Dague*] rationale to equitable fund cases does not defeat the purpose of the equitable fund doctrine," which it defined as the principle that " 'an attorney who creates a fund for the benefit of a class should receive reasonable compensation from the fund for his efforts.' " 800 F.Supp. at 1096 (quoting *"Agent Orange" Litig.,* 818 F.2d at 222).

Similarly, another district court concluded that *Dague* applied equally to common fund and fee-shifting cases. *Nensel v. Peoples Heritage Fin. Group, Inc.,* 815 F.Supp. 26 (D.Me.1993). The *Nensel* court reasoned:

Even in a common-fund case.... [c]ounsel qualify for fees ... almost exclusively *if they prevail.* This is the most weighty incentive provided to counsel to undertake difficult, high-risk class-action cases.... it is enough to provide sufficient motivation to counsel to have them understand that *where they prevail,* they have a sure expectation that fees will be determined in the circumstances of the case and a certainty that they *will be paid.*

*Id.,* 815 F.Supp. at 28. In *Nensel* the court found that in common fund and fee-shifting cases alike, enhancement for contingency risk would promote "weak and unfounded class action suits." *Id.* In essence, the *Nensel* court seems to conclude that attorneys will have sufficient incentive to bring such cases if they know they will be awarded their normal hourly fee if they prevail, but they will receive nothing if they do not, a concept that this court cannot and does not accept. *See also In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation,* 982 F.2d 603, 619 (1st Cir.1992) (Lay,

J., sitting by designation, concurring) (*Dague* prohibition applies to common fund fee awards).

■ Since *Dague,* only one circuit court has considered whether the prohibition on enhancement applies in a case begun under a fee-shifting statute that concludes with a common fund settlement. *See Florin, supra.* There, the Seventh Circuit held that the *Dague* ban was not applicable, despite the circuit's previous ruling that *Dague* bars risk multipliers generally in fee-shifting cases. *Florin,* 34 F.3d at 564. *See Gusman v. Unisys Corp.,* 986 F.2d 1146, 1150 (7th Cir. 1993). The court relied on *Skelton v. General Motors Corp.,* 860 F.2d 250 (7th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) and the ERISA statute itself. "Even more so than the fee-shifting provision in *Skelton,* the terms of ERISA's fee-shifting provision [§ 1132(g)(1) ] do not purport to control fee awards in cases settled with a common fund, nor does the operation of common fund principles in this case conflict with the provision's intended purpose." *Florin,* 34 F.3d at 563.[9]

The Seventh Circuit noted further that extension of the ban on enhancement would not serve the Supreme Court's "policy considerations," emphasizing first that *Dague*'s prohibition on enhancement reflected a concern to protect defendants, who have no liability for attorneys' fees in the common fund context. *Florin,* 34 F.3d at 564. Second, enhancement in a common fund case does not result in defendants "subsidizing plaintiffs' attorneys for unsuccessful lawsuits against other defendants." *Id.* at 565. Third, there is no "injustice in requiring plaintiff class members to shoulder the burden of compensating counsel for prosecuting the class' case without any assurance of compensation." *Id.* Finally, the court noted that enhancement is especially appropriate in class action suits, where class counsel " 'receive[s] no fee if the suit fails, so their entitlement to fees is inescapably contingent.' " *Id.,* citing *Continental Illinois Sec. Litigation,* 962 F.2d at 569.

9. *See also* Mark Berlind, *Attorney's Fees under ERISA: When is an Award Appropriate?,* 71 Cornell L.Rev. 1037, 1060–61 (1986) ("Applying the common benefit doctrine reflects the statute's purpose ... Nothing in ERISA indicates that Congress intended to preempt the common benefit doctrine").

This court is persuaded by this line of reasoning. First, it is unlikely that attorneys will find sufficient incentive to bring even highly meritorious suits that are also complex, innovative, and lengthy if they will at best recover merely their regular hourly rates if they prevail, and nothing if they do not. Second, numerous differences between statutory fee and common fund cases render much of the reasoning in the statutory fees cases inapplicable to the common fund context. Third, as noted in *Florin*, defendants' interests are amply protected in common fund settlements.

Numerous courts have reached the same conclusion, that common fund fee awards need not be governed by statutory fees cases. In *Florin*, the Seventh Circuit reaffirmed its pre-*Dague* ruling that common fund and fee-shifting cases are governed by significantly different standards. *Florin*, 34 F.3d at 564; *Skelton*, 860 F.2d at 252 ("the factors which separate them are much more significant than those that link them").

▇ Among these factors is the basic difference with respect to who pays the attorneys' fees. In fee-shifting cases, the defendant bears the burden of compensating the plaintiff's counsel. In that situation, there is good reason to restrict enhancement of the fee award for contingency due to the paradox Justice White noted in *Delaware Valley II, supra:* enhancing an award for contingency would disproportionately penalize the defendants with the best cases. This paradox does not arise when plaintiffs rather than defendants pay the fees.

▇ In addition, the rationale behind the two types of awards is different. Fee-shifting provisions are designed "to encourage private enforcement of the statutory substantive rights." *Task Force Report*, 108 F.R.D. at 250. Defendants who have violated plaintiffs' rights are compelled to pay the plaintiffs' reasonable costs in enforcing those rights so that plaintiffs will be able to obtain counsel and not have their awards diminished by the expense of obtaining them. In contrast, common fund awards are "based on the equitable notion that those who have benefitted from the litigation should share in its

costs." *Id.* (quoted in *Skelton*, 860 F.2d at 252).

▇ Related to this difference in rationale are differences in the rights at issue and in the roles of the players. In fee-shifting cases, the right to fees belongs to the successful *plaintiff*, whereas in common fund cases, it is the *attorney* who has the right to claim a portion of the fund. *Compare Venegas, supra* (statutory fee claim belongs to plaintiff), *with Lindy I*, 487 F.2d at 165–66 (common fund claim belongs to plaintiff's counsel). Thus, the settlement in this matter extinguished plaintiffs' statutory claim against defendant for reasonable attorneys' fees, and replaced it with the attorneys' equitable claim against the fund. In the latter situation, the court must subject fee petitions to "heightened judicial scrutiny," *In re Fine Paper*, 751 F.2d at 583, and act as a "fiduciary for the beneficiaries." *Task Force Report*, 108 F.R.D. at 251.

Petitioners press a further distinction: because common fund awards are grounded in equity, limitations in fee-shifting awards that are based on statutory construction or congressional intent are inapplicable. Litman Obj. at 11–14. In *LILCO*, 907 F.2d at 1327, the Second Circuit Court of Appeals considered the argument that an equitable fund award from a settlement in a RICO case should be influenced by the fact that if the plaintiff had prevailed at trial, it likely could have recovered fees pursuant to the RICO fee-shifting provision. The court concluded that fee-shifting provisions should only constrain the equitable fund doctrine "if, under a particular combination of facts, the operation of the equitable fund doctrine conflicts with an intended purpose of a relevant fee-shifting statute," in which case "the statute must control and the doctrine must be deemed abrogated to the extent necessary to give full effect to the statute." *LILCO*, 907 F.2d at 1327. Otherwise, the court found, fee-shifting statutes "are generally not intended to circumscribe the operation of the equitable fund doctrine." *Id.* As the Seventh Circuit explained in *Florin*, the use of common fund principles in an ERISA case does *not* conflict with the statute, and hence this concern is not present here. 34 F.3d at 563.

Recognizing the differences between statutory fee and common fund cases, several courts have declined to extend *Dague*'s prohibition to common fund awards. *See e.g., In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1299 n. 8 (9th Cir.1994) ("As yet, there is no consensus whether *Dague* applies to common fund cases, although most courts have refused to extend *Dague*'s rationale to common fund cases"), citing *Edelman v. PSI Assocs. II, Inc.*, 147 F.R.D. 217, 219 (C.D.Cal.1993) (*Dague* applies only to fee-shifting cases); *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993) (contingency risk is factor in determining whether to use a multiplier); *Longden v. Sunderman*, 979 F.2d 1095, 1099 (5th Cir.1992) (lodestar may be enhanced post-*Dague* for contingency risk); *Gottlieb v. Wiles*, 150 F.R.D. 174, 185 & n. 6 (D.Colo.1993) (rejecting notion that *Dague* precludes risk multiplier in common fund cases) (citations omitted). *See also Swedish Hospital*, 1 F.3d at 1268 ("[w]e disagree with the proposition that [*Dague* ]. ... mandate[s] an unenhanced lodestar approach in common fund cases").

Thus, the court concludes that the use of common fund principles in the case at bar is not inconsistent with *Dague*.

## VII. The Fee Award in the Present Case

The court has concluded that the *McLendon/Gavalik* litigation is a common fund case for the purposes of determining a reasonable fee, and that the restrictions the Supreme Court announced in *Dague* and other statutory fee cases are not necessarily applicable. There remains the question of whether the court should determine the appropriate fee according to the lodestar or the percentage-of-the-fund method. Each method presents advantages and difficulties.

### A. The lodestar

The court must first calculate the appropriate hourly rate for each attorney's services and the reasonable number of hours expended on the litigation. Fixing each component of the lodestar involves a number of subsidiary issues.

### 1. Rates

■ The court could calculate the lodestar several ways. One option is to utilize the attorneys' current hourly rates. Though their rates for services performed years ago would of course have been lower, this method approximates reasonable compensation for not having the use of money over time. Report at 13–14. Many of the attorneys have submitted lodestar data based on their actual historic hourly rates, however, and the Master suggests that the court utilize those historic figures and then compensate for the delay in payment by awarding interest. Report at 17.

The court adopts the Master's recommendation that the lodestar amounts be figured on the basis of historic hourly rates, with interest added separately. The correct measure of interest is addressed below.

#### a. Equalization of Rates

■ The Task Force recommended standardization of hourly rates by forum across classes of attorneys, and application of those standard rates to all fee petitions submitted from the forum. 108 F.R.D. at 260–61. Here, however, the Master rejected petitioners' suggestion that the court apply as "forum rates" the hourly rate it approved for the attorneys in *In re First Fidelity Bancorporation Sec. Litig.*, 750 F.Supp. 160 (D.N.J. 1990). Report at 9–10. The Master is correct. *First Fidelity* did not establish forum rates for this district.

As the Master notes, the principal advantage of applying a forum rate in this case would be the equalization of rates across attorneys. Report at 11. By way of example, the Master reports that "for services provided in 1991, Mr. Plotkin claims an historical rate of $295; Mrs. Litman, an historical rate of $200; and Mr. McIntyre, an historical rate of $250." *Id.* The court agrees with the Master's observation that "[i]t is not evident ... that Mrs. Litman's or Mr. McIntyre's services were worth a fraction of Mr. Plotkin's, even though that difference in rates appears to prevail in their different legal communities." Report at 11. Yet the Master found no sufficient evidentiary basis

for adopting a forum rate for this district to apply to all attorney time. Report at 13.

To accomplish equalization for these three attorneys, therefore, the court will derive an annual average rate, equal for each of these three attorneys, weighted according to the historic hourly rates and reasonable hours as found by the Master. A similar weighted average rate will be derived for the two principal associates of the Plotkin and Litman law firms, respectively, Jonah Orlofsky and Martha Helmreich. All other attorneys will be compensated at their historic rates, except as listed below.

### b. Bredhoff & Kaiser and USW Rates

■ The USW's attorneys originally developed the litigation and then sought outside counsel when the magnitude of the case became apparent. Bredhoff & Kaiser represented the plaintiff class in the appeal of the original adverse decision in the *Gavalik/Jakub* litigation. Both groups of attorneys have petitioned for fees through the Litman firm, arguing that their lodestar figures should be computed using current market rates.

Bredhoff & Kaiser offered its services to the USW at a substantial discount from its normal hourly rates. The Master suggests that the particular plaintiff class in this litigation should not be billed by Bredhoff & Kaiser at rates higher than those any other group of Steelworkers would pay. Report at 14. However, the Third Circuit has suggested that public interest attorneys should be compensated at prevailing market rates. *See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 414, 422 (3rd Cir. 1993); *Kean v. Stone,* 966 F.2d 119, 123–24 (3rd Cir.1992); *Student Public Interest Research Group v. AT & T Bell Lab.,* 842 F.2d 1436, 1450 (3rd Cir.1988) (in statutory fee case, use of community rate is appropriate to figure the lodestar); *see also In re Fine Paper,* 751 F.2d at 590 (in fund in court case, use of market rate is appropriate in figuring lodestar). Accordingly, the Master recommends that Bredhoff & Kaiser and the USW submit historic market rates upon which their lodestar awards should be based. As an alternative, the Litman firm suggests that

Bredhoff & Kaiser be compensated at the Litman firm's rate.

The court agrees that Bredhoff & Kaiser should be compensated at rates identical to those of other attorneys on the case. Therefore, the court will calculate the lodestar amounts for these attorneys using the average of the hourly fees for each year charged by the lead attorneys and associates in the case, as set forth in the preceding section, and the firm need not submit information on their historic market rates. Mr. Hoffman should be compensated at his historic market rates, as his submissions show them to be. The USW lawyers should be compensated pursuant to the rates they have requested, and no historic information is necessary. They have declined to be compensated at any higher or enhanced rate and have waived any interest claim.

### c. Siff, Rosen Rates

The New Jersey firm of Siff, Rosen acted as local counsel. The Master expresses some doubt as to whether Siff, Rosen accepted the case under any kind of contingency arrangement. Report at 32, n. 13. The Litman firm claims that Siff, Rosen did accept the case on a contingent basis, and therefore should be compensated on the same basis as the other firms participating in the prosecution of the case. Litman Obj. at 42, citing Affidavit of Gerald T. Ford (July 8, 1992), ¶¶ 4, 5. Siff, Rosen ably fulfilled their responsibilities as local counsel, but their involvement in the litigation was not comparable to that of lead counsel. The court will calculate the lodestar figures for Siff, Rosen based on the firm's actual historic rates, as documented by their submissions.

### 2. Hours

In an Appendix, the Master set forth his specific factual findings regarding the time submissions of the petitioners. The Master found that "the Litman firm (and the other attorneys submitting through the Litman firm petition) has reasonably expended each of the hours included in its petition." Report at 45. Although the Plotkin firm's petition did not contain the same detail in presentation as the Litman firms, the Master found no reason to reduce the Plotkin firm's re-

quest on this basis. *Id.* at 46. In response to the USW's challenge to the Plotkin firm's petition, the Master found that Mr. Plotkin exercised reasonable billing judgment under the special circumstances of this litigation. Specifically, the fact that two very small law firms with small support staffs represented the plaintiffs against "legions of defense attorneys" required at times the performance of certain tasks by somewhat overskilled personnel. Report at 48–49. In this regard, the Master states: "Having observed, intimately, the work of both the Plotkin firm and the Litman firm lawyers over a long period of time, I am certain that they perform their tasks, not with reasonable efficiency, but with exemplary efficiency." *Id.*

In Mr. Plotkin's February 8, 1993 affidavit, however, he testified that in his opinion, roughly one percent of the total lodestar resulted from "duplicative, inefficient, excessive, redundant or otherwise unnecessary" work. He also estimated that fewer than 250 hours of his request were devoted to "catch-up time." Plotkin Aff. at 2, *quoted in* Report at 49. On the basis of these admissions, the Master recommends decreasing the Plotkin lodestar by these amounts, for a total reduction of $157,573. Report at 50.

The Master concludes that there is no basis for the USW's challenges to the hours of its own attorneys, or those of the Plotkin firm. Report at 50. With respect to the USW's challenge to H. Tim Hoffman's hours on the grounds that he impermissibly rounded his hour figures to the nearest whole integer, the Master noted that Mr. Hoffman claims his practice is to round *down.* Although the Master recommended that Mr. Hoffman submit more accurate records in the future, he found no basis to recommend reduction of Mr. Hoffman's hours. Report at 51.

The intervenors object to the Master's finding that the time records submitted by petitioners reflect reasonable expenditures of time. They claim some entries are vague, time records are incomplete, and some activities billed at attorney rates were actually secretarial in nature. Intervenors Obj. at 22. The intervenors argue that this court is required to review each entry *de novo* and

enter a specific finding that each hour for which compensation is requested was well spent. Intervenors Obj. at 23.

The court rejects this argument. If this court were required to review *de novo* every time entry, there would be no point in assigning a Special Master to this task. Indeed, the intervenors' argument would frustrate the very technique of appointing Special Masters to assist in fact-intensive and time-consuming tasks such as this. The Master has reviewed the petitioners' submissions in detail, and has found that they represent reasonable expenditures of time, with the appropriate adjustments. The intervenors present no argument or evidence upon which this court could conclude that the Master's findings in this matter are clearly erroneous, or that the court should now engage in its own version of the "cumbersome, enervating and … surrealistic process" of evaluating the individual fee petitions. *Task Force Report,* 108 F.R.D. at 258. The court accepts the findings of the Master as to the reasonableness of the hours expended on the litigation.

### 3. Interest

 Interest compensates attorneys for the delay in receiving payment. The Master recommends that the court apply the prime interest rate, compounded annually, assuming the court calculates the fee under principles governing fee-shifting cases. Report at 18. Although the petitioners here would have been unlikely to receive such a favorable rate for the substantial amounts they borrowed to sustain themselves during this litigation, the Master reasons that this rate is nevertheless appropriate because, as some courts have noted in approving interest rates below the prime rate, late payment is a common feature of the practice of law. *Id.* The Master adds, however, that if the court elects to determine the award according to the equitable principles governing common fund awards, interest after the date of settlement should be figured at the rate actually earned by the Settlement Fund. Report at 20.

The intervenors object to use of the prime interest rate, suggesting instead use of the statutory post-judgment interest rate set

forth in 28 U.S.C. § 1961, which is the rate for 52–week Treasury bills (on average, 75% of prime). Report at 19; Intervenors Obj. at 15, citing their Sept. 11, 1992 Memo, Tab A, at 64–65; Tab C at 20–21. At the least, according to the intervenors, any interest accrued after settlement should be figured at the rate the settlement fund actually earned. They argue that the court has discretion to so limit the interest calculation, relying on cases holding that courts are not obligated to award interest at the prevailing interest rate. Intervenors Obj. at 16, citing *Black Grievance Comm. v. Philadelphia Elec. Co.*, 802 F.2d 648, 655–66 (3rd Cir.1986), *vacated*, 483 U.S. 1015, 107 S.Ct. 3255, 97 L.Ed.2d 754 (1987) (court is not obligated to employ prime interest rate in compensating for delay in payment); *Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 923 (3rd Cir.1985) (court not required to use prevailing rate of interest).

Because the court has concluded that it should proceed according to common fund principles, it will base the interest rate after settlement on the rate actually earned by the fund. "When, as here, the fund is earning interest, the time value of the money is, to each party entitled to a share, equal to the interest earned on that share pending its distribution." *In re Fine Paper*, 751 F.2d at 588. For fees incurred before that time, the court adopts the Master's suggestion that interest be figured according to the prime interest rate at the time, compounded annually.

#### 4. Fee petition time

 Awards in straight fee-shifting cases include compensation for time spent preparing the fee petition. *See e.g., Institutionalized Juveniles*, 758 F.2d at 924; *In re Fine Paper*, 751 F.2d at 595. In common fund cases, however, the fee award is based upon efforts expended on behalf of the plaintiff class. Therefore, time spent preparing the fee petition may not be compensated in the award. *See Kinney v. International Brotherhood of Electrical Workers*, 939 F.2d 690, 694 n. 5 (9th Cir.1991); *Donovan v. CSEA Local Union 1000, etc.*, 784 F.2d 98, 106 (2nd Cir.), *cert. denied*, 479 U.S. 817, 107

S.Ct. 74, 93 L.Ed.2d 30 (1986); *In re Fine Paper*, 751 F.2d at 595. The Master argues against compensating fee petition time, on the ground that these efforts were not expended on behalf of the class. Report at 20–21. As the Litman firm points out, this conclusion is correct if the court proceeds under the equitable common fund theory, but incorrect if the court proceeds under the statutory fee-shifting theory recommended by the Master.

Having determined that the instant petitions must be analyzed under common fund principles, the court concludes that it may not include in the award compensation for time spent preparing the fee petitions. Post-petition time expended for the benefit of the class, however, is to be compensated at current rates plus interest.

#### B. Enhancement of the lodestar

The Supreme Court has declared in its statutory fees cases that many of the factors typically used to justify the application of a fee enhancer are already reflected in the lodestar figure, and has held that only rare cases will require the use of enhancers to reach a reasonable fee. *Blum*, 465 U.S. at 898, 104 S.Ct. at 1548–49. Although enhancement of the lodestar in statutory fee cases have been largely disallowed, *see Dague*, as discussed above, these prohibitions do not necessarily apply in common fund cases or in ERISA cases that settle with a common fund. *Florin, supra.* Therefore, the court will consider relevant bases for enhancement of the lodestar.

#### 1. Risk

 In *Lindy I*, the Third Circuit Court of Appeals held that in a common fund award, a court must account for the risk of non-payment. *Lindy I*, 487 F.2d at 168. *See also In re Fine Paper*, 751 F.2d at 583 ("Once [the] lodestar amount is determined the court must adjust it to reflect the contingent nature of the attorneys' undertaking.").

The Master argues against applying a risk multiplier, citing *Delgrosso v. Spang & Co.*, No. 91–3646 (3rd Cir. Aug. 24, 1992), in which the Third Circuit rejected an enhancement for risk in a ERISA case pursuant to

*Dague.* From the appellate court's decision, however, it is apparent that the plaintiffs applied for fees under the ERISA fee-shifting provision; the *Delgrosso* court did not concern a common fund situation.

The intervenors argue that no risk enhancement is appropriate because petitioners have failed to demonstrate that plaintiffs would have had substantial difficulty in finding counsel absent a contingent fee agreement. Intervenors Obj. at 19. If a court were always prohibited from considering risk in calculating fees, no attorney would undertake a case such as this on a contingent basis. More importantly, plaintiffs such as McLendon, Gavalik, and Jacob may not have been able to obtain counsel. In the marketplace, cases are usually taken on either a contingency or hourly basis, or some combination thereof. The contingency agreement contemplates a greater fee if successful, and no fee if not. The usual hourly arrangement provides for a fee based upon the time devoted—win or lose. It is unlikely that a lawyer would accept the proposition that if she lost a case, she would be paid nothing, but if she prevailed, she would be paid merely her normal hourly rate. The court declines to find that the Supreme Court intended to force attorneys to accept such a bad bargain even when their fees are to be paid by their own clients, not the defendant; nor that it would have wanted to deny plaintiffs such as these access to competent counsel. Accordingly, the court finds that some enhancement for risk is appropriate in this case. There remains, of course, the issue of how to quantify this risk.

The Litman firm argues that the court may account for risk either by applying an appropriate multiplier to the lodestar figure or by using a percentage of the fund method. Litman Obj. at 28.

The Master recommends that if the court applies a risk multiplier, that it be weighted according to the degree of risk of non-payment involved in various phases of the litigation. Specifically, the Master recommends a multiplier of 2.5 for the period from the filing of the ligation through the Third Circuit's *Gavalik* decision in February, 1987; a multiplier of 2.0 from the *Gavalik* decision through this court's decision on the St. Louis plant in the *McLendon* case in June, 1989; a multiplier of 1.25 from this court's 1989 *McLendon* decision through the signing of the Settlement Agreement in December, 1990; and a multiplier of 1 or 1.05 from the Settlement Agreement to the filing of the fee petitions in April, 1992. Report at 35.

Both petitioners and the intervenors object to this method of accounting for risk. The intervenors assert that petitioners never really faced much risk of non-payment, and that any risk was eliminated after plaintiffs prevailed on the ERISA claim in the Third Circuit's 1987 *Gavalik* decision, or at the latest when this court issued its 1989 decision regarding the St. Louis plant. Intervenors Obj. at 19–21. Petitioners also object to the Master's recommendation, arguing that any risk enhancement must be based solely on an estimation of the risk faced at the outset, when the case was originally filed.

The Third Circuit has held that risk assessment is measured at the filing of the suit and does not vary over time. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. ("Lindy II")*, 540 F.2d 102, 117 (3rd Cir.1976); *Hall v. Roselle*, 747 F.2d 838, 843 (3rd Cir.1984). Indeed, one court addressing the suggestion of a declining risk multiplier specifically rejected it on this ground. *See Aamco Automatic Transmissions, Inc. v. Tayloe*, 82 F.R.D. 405, 414 (E.D.Pa.1979). The court agrees that contingency risk is properly evaluated at the outset of the litigation, and declines to adopt the Master's suggestion of the declining multiplier.

Neither does the court accept the figures petitioners offer as a reasonable assessment of the risk they faced at the outset of this litigation. Though the Litman firm originally suggested a risk multiplier of 2, it argues that if the court accepts the Master's assessment of an initial risk factor of 2.5, that this factor must be applied to the entire lodestar amount. Litman Obj. at 31. The Plotkin firm argues that it deserves a multiplier of more than 2.5, but that if the court accepts the 2.5 figure it should be applied to the

entire lodestar amount. Plotkin Obj. at 30–31.[10]

Although the court disagrees with intervenors' contention that petitioners faced little risk of non-payment, the court appreciates the significance of their contention that most of the evidence leading to plaintiffs' substantial victory through settlement was already known when petitioners took on the case. *See* Report at 29. The hardships petitioners have endured in this litigation have been mammoth, but those hardships should not be confused with risk of non-payment. Because a degree of risk was involved due to the uncertainty of the law governing the case at its outset, *see* Plotkin Obj. at 32–36 (*quoting* Plotkin Aff. at ¶¶ 14, 16–25), the court agrees that a risk multiplier is appropriate. There are other grounds as well, however.

## 2. Enhancement on other grounds

The Task Force recommended that courts no longer consider several grounds for enhancement because they are already reflected in the lodestar, but recommended that courts continue to consider applying multipliers for certain other grounds. For example, the Task Force recommended that the contingency factor be considered in *all* cases, and that courts evaluate the result obtained, the attorney's contribution to a prompt or delayed resolution of the action, and the delay in receiving fees. *Id.* at 265. The court has already considered the contingency factor, and has accounted for the delay in payment through an award of interest. The court now turns to grounds for enhancement suggested by the parties, other than risk.

### a. Quality

■ The Task Force recommended that the quality factor be eliminated from consideration as a ground for enhancing the lodestar, since it "reflects the type of performance expected of all attorneys," and involves a subjective inquiry susceptible to discriminatory application. 108 F.R.D. at 264–

65. The court agrees, and declines to apply any enhancer to the lodestar on the basis of the quality of the petitioners' skills.

### b. Result obtained

The Master concluded that since *Dague* prevented courts from enhancing lodestar figures because of the difficulty of the issues, enhancement for exceptional results, which he saw as the converse of difficulty, is also prohibited in fee-shifting cases. Report at 28. Indeed, the Supreme Court said in another fee-shifting case that the "results obtained" would not normally justify enhancement, since it is subsumed in the other factors used to calculate the lodestar. *Blum,* 465 U.S. at 900, 104 S.Ct. at 1549–50.

In addition, the Master concluded that the Task Force had recommended against allowing enhancement on the basis of the results obtained, citing its recommendation that the "quality" factor be eliminated as a basis for lodestar enhancement. Report at 28, citing Task Force Report, 108 F.R.D. at 264. The court notes, however, that the Task Force considered these two factors separately, and indeed recommended that the results obtained *should* be considered in adjusting the basis lodestar fee. Task Force Report, 108 F.R.D. at 265.

■ The Plotkin firm describes the extraordinary efforts the petitioning attorneys expended to obtain the highest amount possible in settlement. The exceptional results obtained, it argues, calls for an enhancement of the lodestar apart from any risk enhancement. Further, it argues that even if the court were to find that risk enhancement were barred by *Dague,* that case in no way prohibits enhancement based on exceptional results. Plotkin Obj. at 23–28. Indeed, the Master also noted the exceptional nature of the results obtained. Report at 28.

The Litman firm, too, argues for an enhancement based on exceptional results. In a common fund case, exceptional results may be established by the size of the settlement

---

**10.** The Plotkin firm voices a host of specific objections to the Master's assessment of the risks faced in each phase of the litigation, and describes vividly the risks and hardships the Plotkin attorneys faced over time as a result of their representation of the plaintiff class. The court acknowledges the force of these objections, but will not address them more specifically because the court agrees that risk must be assessed at the outset of the litigation.

award. *Lindy I*, 487 F.2d at 168. Further, the Litman firm repeats that *Dague* is not applicable to common fund cases, and in any event *Dague* did not consider enhancement for exceptional results. Litman Obj. at 34–35.

The court agrees with petitioners that enhancement on the grounds of exceptional results obtained should be permitted in common fund cases, and indeed, will align the interests of lawyers and their clients in seeking the best possible result. Keeping in mind its role as fiduciary for the class in determining the appropriate equitable fee award, the court finds that a multiplier, justified on the basis of risk, is also justified by the extraordinary results achieved in this case, standing alone or in combination with the risk calculus.

The court finds and concludes that the appropriate multiplier, considering all of the above factors, is 1.5. This multiplier shall be applied to the lodestar amounts through the month of December 1990, the month of the settlement agreement for all the petitioning attorneys and firms except the USW. The multiplier shall not apply to lodestar amounts after the settlement date, nor to the USW lawyers, pursuant to their request and waiver.

Calculations of the lodestar amounts, interest, and enhancement are set forth in the Appendix attached to this opinion. The figures were prepared by the Special Master, Prof. George L. Priest, pursuant to the decisions made above.

The court recognizes the difficulty and arbitrariness in selecting a precise multiplier, particularly in a case where a tenth of a percent has significant impact on the result. However, in keeping with the court's view that an attempt should be made to replicate what would be deemed fair in the marketplace, a multiplier of 1.5 would appear to do so. Contemplating a lawyer who would normally charge $250 an hour, payment of a bonus of $125 for each and every hour expended, based upon the foregoing factors, seems to be eminently fair and reasonable. The court concedes that a like scenario could be advanced for a greater or lesser amount, but it concludes that this multiplier plus interest properly addresses all of the appropriate factors discussed above, particularly since it results in additional compensation of approximately ten million dollars over the lodestar.

## C. Percentage method

As noted previously, several courts have adopted the recommendation of the Task Force that common fund awards should be based on a percentage-of-the-fund method of calculation. In *Florin*, for example, the Seventh Circuit explicitly deferred to "the district court's familiarity with the litigation" and directed the lower court to use *either* a lodestar or percentage method, whichever was "most efficient and suitable." *Florin*, 34 F.3d at 566.

In adopting the percentage method, the Court of Appeals for the District of Columbia articulated some of the advantages of this method. First, a percentage recovery creates the best incentives for efficient expenditure of attorney time and effort in common fund cases. *Swedish Hospital*, 1 F.3d at 1269. Second, the percentage method approximates the way in which attorneys are compensated for such cases in the marketplace. *Id.*, citing Judge Posner in *Continental Illinois Sec. Litigation*, 962 F.2d at 572. Third, the percentage method is generally "less demanding of scarce judicial resources than the lodestar method." *Swedish Hospital*, 1 F.3d at 1269. Also, because it involves fewer discrete subjective judgments, the percentage method is in the aggregate less subjective than the lodestar. *Id.* at 1270.

The Master finds the strongest argument in favor of this method is that contingency percentages are very common in the marketplace, and "are endorsed by economists and leading lawyers as appropriate for aligning the interests of attorneys and clients prior to the litigation, since the larger the judgment or settlement obtained for the client, the larger the fee to the attorney." Report at 37, citing Aff. of Prof. Arthur Miller, Plotkin Petition. The Master concludes, however, that after settlement, these advantages of the percentage method are less evident. Report at 38. The Master further reasons that

where a percentage recovery is suggested *after* settlement, but was not negotiated prior to settlement, the percentage is more frequently justified on quantum meruit grounds than as compensation for contingency risk. Report at 38. Given the availability of the lodestar plus interest, the quantum meruit basis for a percentage award is inapplicable, since the value of the services rendered may be more precisely determined. Therefore, the Master argues, any efficiency reasons. that might in theory support the use of the percentage method are inapplicable here, because the calculations necessary to determine the lodestar figures, for the most part, have already been performed. Report at 38.

Petitioners advise, however, that the Master's conclusion is unjustifiably optimistic, since the USW is likely to continue to challenge the lodestar figures on appeal. They argue further that application of the percentage method would, at a minimum, simplify issues on appeal. Litman Obj. at 32–33; Plotkin Obj. at 49. In addition, the Litman firm argues that use of the percentage method here will prompt other attorneys to undertake similar actions. Litman Obj. at 31. Other courts have acted in part on this suggestion. *See e.g., Swedish Hospital, supra; Camden I,* 946 F.2d at 774; *Paul, Johnson, Alston & Hunt,* 886 F.2d at 271.

The Plotkin firm presses more strongly for use of the percentage method, citing to its use in a recent case from the Eastern District of Pennsylvania. *See U.S. Bioscience Sec. Litig., supra.*

The most obvious problem with this method is, of course, determining the appropriate percentage to award. Most common fund fee awards comprise 20–30% of the fund. *Task Force Report,* 108 F.R.D. at 247, n. 32. Although it is difficult to fix a percentage to which the parties would have agreed *ex ante,* the court recognizes that such a percentage might have been more that the 13.6% petitioners now seek. In addition, the court notes that the extraordinary size of the fund is due in large part to the size of the class, and that a percentage-of-the-fund award would therefore result in an unusually large award for petitioners merely because the plaintiff class contained so many members.

If the class were comprised of only 1,000 members and the fund were correspondingly smaller, petitioners would still have expended the same amount of time and effort, but the size of their award would be much less. Petitioners should not receive a fee five times greater for that same effort merely because the plaintiff class contains some 5,000 members.

Courts making awards based on a percentage seek to reconstruct the contingency agreement the parties would have reached at the outset of the representation. *See* Task Force Report, 108 F.R.D. at 255–58; *U.S. Bioscience Sec. Litig.,* 155 F.R.D. at 118–119. Due to the extraordinary size of this fund, any contingency percentage to which the parties might have agreed at the outset would yield an unacceptably high award. Therefore, a percentage award is not practicable, unless the court simply arrived at an appropriate fee and then calculated the percentage to reach it. This the court should not do.

A less obvious but similarly perplexing problem with this approach is determining what amounts should be considered as part of the "common fund" obtained for the benefit of the class, from which the award should come—or, as the Master put it, determining "percentage of what?" Report at 39. The settlement expressly included the amount anticipated to compensate for the tax obligations of the defendant, and apparently also included an amount estimated to cover attorneys' fees. The court questions whether these amounts should be included or excluded from the "fund" for purposes of figuring a fee.

Because the court can discern no way to remain true to the goal of replicating the market and also arrive at a reasonable percentage award, the court declines to engage further in the exercise and will base the award on the enhanced lodestar figure as set forth above.

## VIII. Subsidiary Issues

Two other matters are pending before the court.

## A. Rule 11 sanctions against Continental Can

In the December, 1990 Settlement Agreement, defendant Continental Can and the USW also settled the third-party action Continental had brought against the USW. The Master recommends that this settlement be deemed to have included settlement of the USW's motion for Rule 11 sanctions against Continental, and that the court dismiss that motion. No party objects to this recommendation, and the court adopts it. The USW's motion for Rule 11 sanctions against Continental due to the third-party action Continental asserted against the USW is hereby dismissed.

## B. Sanctions against Michael Brown and counsel for intervenors

Plaintiffs' counsel moves for sanctions against the USW's expert, Michael Brown and counsel for the intervenors. The Master recommends denying the motion. The court reserves decision and will return the motion to the Master for further briefing and other appropriate proceedings.

## IX. Conclusion

The court recognizes that it has rendered imperfect justice here. Its determination is predicated on a mathematical formula in a matter that is not susceptible to such precision. In arriving at this decision the court has strived to consider the many and varied factors set forth at the outset of this opinion. It is hoped that this decision confers reasonable compensation on counsel, encourages others to undertake such matters, will serve to provide counsel for those who could not otherwise afford it, and promotes confidence and respect for the judicial system.

The rejection of the full amount sought in this matter is not meant to diminish in any way the quality of the performance of counsel or the depth of their dedication in the highest traditions of the bar. The court reiterates that they performed in a heroic, superb, and extraordinary manner. Indeed,

if the *Dague* case still permits enhancement in the exceptional case, this is such a case.

SO ORDERED.

## APPENDIX

For purposes of determining the lodestar, the "lead attorney" rate (prior to interest), derived by determining the average of the historical rates of Mr. Plotkin, Mrs. Litman and Mr. McIntyre weighted by annual hours expended, is as follows:

| | | | |
|---|---|---|---|
| 1981: | $125.00 | 1987: | $201.84 |
| 1982: | $126.88 | 1988: | $225.06 |
| 1983: | $141.46 | 1989: | $236.60 |
| 1984: | $148.57 | 1990: | $243.93 |
| 1985: | $161.90 | 1991: | $259.06 |
| 1986: | $191.10 | 1992: | $257.10 |

Similarly, the "associate" rate (prior to interest), derived by determining the average of the historical rates of Mr. Orlofsky and Ms. Helmreich, weighted by annual hours expended, is as follows:

| | | | |
|---|---|---|---|
| 1983: | $ 70.00 | 1988: | $145.46 |
| 1984: | $ 89.38 | 1989: | $162.09 |
| 1985: | $ 89.99 | 1990: | $148.95 |
| 1986: | $109.98 | 1991: | $177.80 |
| 1987: | $124.70 | 1992: | $178.93 |

Interest is calculated at the prime rate until December 31, 1990 and at the rate of earnings of the Settlement Fund thereafter. The method of compounding interest proposed in the Litman petition will be employed because the Plotkin petition method cannot be implemented without daily or monthly charge entries which are not separately reported. The annual average prime interest rate as reported by the Federal Reserve [11] and the annual average return on the Settlement Fund is as follows:

| | | | |
|---|---|---|---|
| 1981: | 18.87 percent | 1988: | 9.32 percent |
| 1982: | 14.85 | 1989: | 10.87 |
| 1983: | 10.79 | 1990: | 10.01 |
| 1984: | 12.04 | 1991: | 5.9414 |
| 1985: | 9.93 | 1992: | 3.7451 |
| 1986: | 8.33 | 1993: | 3.2529 |
| 1987: | 8.21 | 1994: | 3.6947 |

Below is the derivation of the fee award to the Litman and Plotkin firms, respectively, calculated according to the principles set forth above.

11. *Statistical Abstract of the United States 1993* at 520, Table 826.

### Litman Firm Summary: Gavalik

| | Lodestar fees through 12/90 | Multiplier at .5 | Interest through 4/92 | Lodestar fees plus interest 1/91–4/92 | Grand Total |
|---|---|---|---|---|---|
| R. Litman | $431,250 | $215,625 | 285,942 | $143,273 | $1,076,090 |
| D. McIntyre | 706,752 | 353,376 | 602,429 | 22,903 | 1,685,460 |
| M. Helmreich | 142,952 | 71,476 | 40,877 | 50,942 | 306,247 |
| Other Litman | 217,524 | 108,762 | 217,574 | 83,873 | 627,733 |
| Bredhoff [12] | 115,977 | 57,988 | 101,467 | 540 | 275,972 |
| Siff, Rosen | 2,979 | 1,489 | 733 | 11 | 5,212 |
| Total Litman | $1,617,434 | $808,716 | $1,249,022 | $301,542 | $3,976,714 |
| Total USW | | | | | $ 185,603 |

### Plotkin Firm Summary: McLendon

| | Lodestar fees through 12/90 | Multiplier at .5 | Interest through 4/92 | Lodestar fees plus interest 1/91–4/92 | Grand Total |
|---|---|---|---|---|---|
| R. Plotkin | $2,162,272 | $1,081,136 | $1,109,512 | $280,451 | $4,633,371 |
| D. McIntyre | 2,621,759 | 1,310,879 | 1,299,662 | 528,905 | 5,761,205 |
| J. Orlofsky | 686,555 | 343,278 | 466,865 | 118,904 | 1,615,602 |
| Other Plotkin [13] | 7,129,612 | 3,564,806 | 3,650,413 | 1,120,100 | 15,464,931 |
| Total Plotkin | $12,600,198 | $6,300,009 | $6,526,452 | $2,048,360 | $27,475,109 |
| Total USW | | | | | 21,006 |

These fees shall earn interest at the rate of earnings of the Settlement Fund and shall be paid net of interim fees (including full payment to the USW) awarded in 1992. Interest below is shown calculated through November 1994:

### Post–Petition Interest and Payments

| | Litman Firm Award | Plotkin Firm Award |
|---|---|---|
| Award thru 4/92: | $3,976,714 | $27,475,109 |
| Post-petition interest thru 11/94: | 253,648 | 1,583,064 |
| Total Award: | $4,230,362 | $29,058,173 |
| Less interim payment: | (1,600,648) | (13,203,256) |
| Net Amount Owing w/interest thru 11/30/94: | $2,629,714 | $15,854,917 |

12. For purposes of the Bredhoff & Kaiser fees, Attorneys Bredhoff, Gottesman and Weinberg shall be reimbursed at the lead attorney rate, and Attorneys Clark, Shinevar and Estlund, at the associate rate. Paralegals and law clerks will be compensated at rates as provided in the petition.

13. The reduction of $157,573 from the Plotkin lodestar is taken in equal annual increments for the years 1985 through 1992, the years of substantial Plotkin firm investment.